

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-09-00182-CR

ALEJANDRO ORONA                                          APPELLANT

V.

THE STATE OF TEXAS                                          STATE

------------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

### I. INTRODUCTION

A jury found Appellant Alejandro Orona guilty of murder and assessed his punishment at life imprisonment. The trial court sentenced him accordingly. In eight points, Orona argues that insufficient evidence exists to sustain his conviction and that the trial court erred by not submitting jury charges on lesser offenses and by admitting hearsay in violation of Orona's federal and state constitutional rights to cross-examination. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Scott Sartain was a methamphetamine user and an insulin-dependent diabetic. He stole his grandmother's checkbook, forged a check, and got his friend Natalie Bazan to cash it. The bank confirmed that the check was forged, and police arrested Bazan. Bazan's husband, Brian Johns, was upset about Bazan's arrest, and after Johns bailed her out of jail, the two confronted Sartain at Orona and Kelly Munn's house, where Sartain was staying at the time.

Johns and Bazan found Sartain in a back room with Munn and confronted him. Johns and Bazan both hit Sartain, and when Sartain started to leave, Munn "just started jumping on him." Orona came into the room and joined in the beating, kicking and hitting Sartain. Munn said, "Go to sleep, bitch," while hitting Sartain. Sartain covered his head and was knocked to the ground. Bazan and some of the other people at the house yelled for Orona and Munn to stop, but they continued kicking and hitting Sartain. Bazan, Johns, and the other people in the house fled as the beating continued.

Melissa Morante—who had fled the house during the fight—returned the following day. Orona and Munn were playing loud music, and Morante could hear moans coming from the garage. Munn and Orona had blood on their shoes. Both told Morante that Sartain was in the garage. Rebecca Brauer, who had heard about the beating, also went to Orona and Munn's house a few days after the fight. In front of Brauer, Munn told Orona that he needed to feed and water the "dog" and pointed toward the garage. Daniel Osborne, a friend of Munn's,

2

went to the house after the fight, and Munn told Osborne that he and Orona had beaten Sartain because he owed them money; Munn asked Osborne to check on Sartain in the garage, but Osborne did not because he "didn't want to believe it."

Days after the fight, Munn called Johns and asked him to bring over some Fabuloso floor cleaner. When Johns arrived, the house smelled like "rotten garbage" and was freezing inside. He noticed that dryer sheets had been placed in all of the air-conditioning vents. Orona and Munn came out of a back room, and Johns could see a hacksaw and knives on a table in that room. He saw Munn hold up Sartain's severed head. Johns ran out of the house and to a nearby motel to tell friends what he had seen.

Osborne returned to Munn and Orona's house a second time and noticed that it "smelled like hot garbage and nasty meat." Munn and Orona were cleaning the house—mopping with Fabuloso cleaner and taking out the trash. Munn and Orona had rubbed Vicks vapor rub over their noses. Munn told Osborne that they had cut up Sartain's body, and Munn asked for Osborne's help disposing of it. Osborne refused, but he later helped them load Sartain's car and a bathtub full of trash bags and brush onto a trailer. Some acquaintances of Munn and Orona's drove the trailer to a rural area near Waco, where more acquaintances cut up Sartain's car for scrap metal and burned the trash bags.

Police got a tip about a murder a few months later. They eventually tracked down witnesses. Sartain's body was never found. Approximately seven months after the beating, police searched Orona and Munn's house for evidence

3

of a murder. Orona and Munn no longer lived there. Police applied a chemical that can detect blood to the walls and floors. Although it showed some areas that could have blood on them, police were unable to remove those areas for further testing before the chemicals destroyed the potential DNA samples. DNA samples that the police took from baseboards in the house did not test positive for Sartain's blood.

### III. SUFFICIENCY OF THE EVIDENCE

In his fifth and seventh points, Orona complains about the legal sufficiency of the evidence. In his sixth and eighth points, Orona complains about the factual sufficiency of the evidence. Because the Texas Court of Criminal Appeals recently held in *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010), that there is no meaningful distinction between the factual sufficiency standard and the legal sufficiency standard, we analyze Orona's insufficiency arguments under only the legal sufficiency standard.

### A. Legal Sufficiency Standard of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

4

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13. In determining the legal sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, we "must presume— even if it does not affirmatively appear in the record—that the trier of fact

5

resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

## B. Sufficiency of Evidence to Prove Murder

In his fifth and sixth points, Orona argues that the evidence is insufficient to prove that Sartain is deceased or to prove the cause of his death. Specifically, he argues that Sartain's body was never found, that no witness testified to seeing Sartain's murder, and that the evidence suggests that Sartain "is hiding from his family, his enemies, or the law."

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1) (Vernon 2003); *Hall v. State*, 137 S.W.3d 847, 852 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd). A person acts "intentionally," or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. Tex. Penal Code Ann. § 6.03(a) (Vernon 2003). A person acts "knowingly," or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

In a homicide case, the State is not required to produce a body. *See Fisher v. State*, 851 S.W.2d 298, 303 (Tex. Crim. App. 1993) ("[P]roduction and identification of the victim's body or remains is not part of the corpus delicti of murder."). The State must show the death of the victim caused by the criminal

act of the defendant. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

In this case, the jury charge included, and the indictment alleged, several manners and means by which Orona murdered Sartain: by a manner and means unknown to the grand jury, or

> by kicking [Sartain] with his feet or by punching him with his hands or by preventing [him] from obtaining insulin in sufficient quantities to prevent his death when [Orona] knew that . . . Sartain was an insulin-dependent diabetic, or by a combination of any or all of the aforementioned means.

The evidence demonstrates that Orona and Munn kicked and punched Sartain, continued to do so despite the pleas of others in the house to stop, and put Sartain in their garage after beating him. Two witnesses testified that Orona had blood on his shoes after the incident. Morante testified that the day after the fight, she heard moans coming from the garage over the sound of loud music and that both Munn and Orona told her that Sartain was in the garage. Brauer testified that she heard Munn tell Orona to feed and water "the dog" as he pointed to the garage. Munn told Osborne that Sartain owed him and Orona money and that they beat Sartain and put him in the garage.

During oral argument to this court, Orona's appellate counsel admitted that evidence shows that Sartain was severely beaten, but he argued that no evidence shows that Sartain is now deceased. To the contrary, evidence exists that Sartain died at some point after the beating and that Munn and Orona disposed of his body with the help of their friends. Munn told Osborne, in front of

7

Orona, that Sartain had died "during [Orona's] shift of watching him" and that Munn knew Sartain was an insulin-dependent diabetic and was trying to find him insulin. Sartain required at least two insulin shots daily, and he often stayed with people who had refrigerators so that he could store his insulin. His diabetes was so severe that, without insulin, he could go into a diabetic coma and die within twenty-four hours; physical injuries could also exacerbate his diabetes.

Several witnesses described a foul odor at the house days after the beating and saw Orona and Munn cleaning with Fabuloso cleaner. Orona and Munn turned down the air conditioner, put dryer sheets over the air-conditioning vents, and rubbed Vick's vapor rub on their noses. Johns saw Munn hold up Sartain's severed head, and another witness testified that Munn said he and Orona had cut up Sartain's body. Witnesses testified that Munn and Orona had acquaintances haul Sartain's car and a bathtub full of trash bags to a rural area to be burned and disposed of. After the beating, none of Sartain's family and friends ever heard from him again; Sartain's cell phone records show that his phone was disconnected for lack of payment two months after the beating. Sartain's mother testified that, after the forgery incident, she told Sartain that she never wanted to see him again. But she also explained that he was very close with his grandmother and would go to her house for lunch or dinner almost daily although he had not attempted to contact her since the check-forgery incident.

Orona also argues that insufficient evidence exists to show that he knew that Sartain was an insulin-dependent diabetic; consequently, Orona argues that

8

he could not have intentionally or knowingly caused Sartain's death by preventing him from obtaining insulin in sufficient quantities to prevent his death. When, as here, a jury returns a guilty verdict on an indictment charging several alternate manners and means, the verdict stands if the evidence is sufficient with respect to any of the acts charged. *See Kitchens v. State*, 823 S.W.2d 256, 259 (Tex. Crim. App. 1991), *cert. denied*, 504 U.S. 958 (1992); *Burnett v. State*, 842 S.W.2d 296, 299–300 (Tex. App.—Fort Worth 1992, pet. ref'd). Not only was there evidence tending to show that Orona knew that Sartain was an insulin-dependent diabetic and that Orona deprived him of insulin, but evidence existed to show that Sartain's death was caused by Orona's kicking or punching him or by a combination of any or all of the alleged manners and means.[1] *See Burnett*, 842 S.W.2d at 300.

---

[1]The dissent confuses and mixes rule 803(24)'s corroboration requirement—which Orona does raise, with an article 38.14 corroboration requirement—which Orona does not raise. *Compare* Tex. R. Evid. 803(24) (requiring that in criminal cases a statement against interest tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement), *with* Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005) (requiring corroboration of accomplice witness testimony by other evidence tending to connect the defendant with the offense committed). Although Orona does not anywhere in his brief challenge the corroboration of Bazan's and Johns's testimony, the dissent sua sponte raises this issue. Even if Orona had raised an accomplice witness corroboration issue, direct testimony from witnesses who were not involved in the beating or were not otherwise accomplices or parties exists tending to connect Orona with the charged offense and corroborating Bazan's and Johns's testimony. *See* Tex. Code Crim. Proc. Ann. art. 38.14; *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1082 (2000). Testimony from Brauer, Morante, and Osborne established that Orona and Munn beat up Sartain in their house and that, after the fight, they had

Viewing the evidence in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Sartain is not hiding but is, in fact, deceased and that Orona caused Sartain's death by one, or a combination, of the manners and means alleged in the indictment, that is, by kicking Sartain, punching him, depriving him of insulin when Orona knew he needed it to survive, or a combination of these manners and means. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778. Accordingly, we hold that the evidence is legally sufficient to support Orona's conviction. We overrule Orona's fifth and sixth points.

### C. Deadly Weapon Finding

In his seventh and eighth points, Orona argues that the evidence is insufficient to prove that he used a deadly weapon. However, the jury was not asked to make a deadly weapon finding, and the trial court did not enter a deadly weapon finding in the judgment. Consequently, we overrule Orona's seventh and eighth points.

### IV. JURY CHARGE

The jury was charged with murder and the lesser-included offenses of manslaughter and aggravated assault, but the trial court denied Orona's requests

---

blood on their shoes, moans could be heard coming from the garage over loud music, the house smelled of rotting meat, Orona and Munn cleaned the house and mopped the floors, and Sartain's car, along with trash bags and a bathtub, were hauled from Orona and Munn's house. In part V of our opinion, we address the issue Orona did raise—that the statements of Jones, Brauer, and Osborne constitute "inadmissible hearsay" and "were not admissible because there is no evidence that clearly indicated they were trustworthy."

that the jury charge include charges on criminally negligent homicide and assault causing bodily injury. Orona argues in his first and second points that the trial court erred by not including charges on criminally negligent homicide and assault causing bodily injury.

### A. Standard of Review and
### Law on Lesser-Included-Offense Instructions

Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see also Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009). Initially, we must determine whether error occurred. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Abdnor*, 871 S.W.2d at 731–32.

A defendant is entitled to an instruction on a lesser offense if (1) the lesser offense is a lesser-included offense of the charged offense and (2) there is some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense. *Guzman v. State*, 188 S.W.3d 185, 188 (Tex. Crim. App. 2006). We must review all evidence presented at trial to make this determination. *Lugo v. State*, 667 S.W.2d 144, 147 (Tex. Crim. App. 1984). In reviewing the second prong of this test, there must be some evidence from which a rational jury could acquit the defendant of the greater offense while convicting him of the lesser-included offense. *Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998). The evidence must establish the

11

lesser-included offense as a valid rational alternative to the charged offense. *Wesbrook v. State*, 29 S.W.3d 103, 113–14 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001).

## B. Requested Charge on Assault Causing Bodily Injury

A person commits assault by intentionally, knowingly, or recklessly causing bodily injury to another. *See* Tex. Penal Code Ann. § 22.01(a)(1) (Vernon Supp. 2010). The assault becomes an aggravated assault if the person uses or exhibits a deadly weapon. *Id.* § 22.02(a)(2) (Vernon Supp. 2010). A deadly weapon means "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(B) (Vernon Supp. 2010).

In this case, because simple assault is included within the proof required to establish the aggravated assault charged, Orona was entitled to a charge on assault causing bodily injury if some evidence in the record would permit a jury rationally to find that Orona did not use or exhibit a deadly weapon. *See Guzman*, 188 S.W.3d at 188; *Lugo*, 667 S.W.2d at 147; *Jones v. State*, 241 S.W.3d 666, 671 (Tex. App.—Texarkana 2007, no pet.). The question becomes whether there is evidence in the record that would permit a rational finding that Orona beat Sartain with his hands or feet but that he did not use or intend to use his hands or feet in a manner capable of causing death or serious bodily injury. *See* Tex. Penal Code Ann. § 1.07(a)(17)(B).

12

Orona argues that he was entitled to such a charge because Dr. Lloyd White testified generally that hands and feet could be used in an assaultive manner while not constituting deadly weapons. However, this generalized testimony is not some evidence to show that, in this case, Orona did not use his hands and feet as deadly weapons. It is well established that hands and feet can be deadly weapons, and nothing in the record suggests that Orona did not intend to use his hands or feet in a manner capable of causing death or serious bodily injury. *See, e.g.*, *Lane v. State*, 151 S.W.3d 188, 192 (Tex. Crim. App. 2004) (holding that hands can be deadly weapons); *Powell v. State*, 939 S.W.2d 713, 717 (Tex. App.—El Paso 1997, no pet.) (holding that feet can be deadly weapons). The evidence shows that Orona and Munn severely beat Sartain by repeatedly hitting and kicking him, even after Sartain fell to the floor. They continued hitting and kicking him despite the pleas of others to stop, and the others fled the house because they did not want to continue watching the beating. Chris Craven testified that Munn once threatened him by showing him several photographs of Sartain after the beating in which Sartain's head looked "like a melon."

Because there is no evidence from which a rational jury could conclude that Orona beat Sartain with his hands or feet, but that he did not use or intend to use his hands or feet in a manner capable of causing death or serious bodily injury, we hold that the trial court did not err by refusing to instruct the jury on assault causing bodily injury. We overrule Orona's second point.

13

## C. Requested Charge on Criminally Negligent Homicide

To be found guilty of murder, a defendant must be found to have intentionally or knowingly caused the death of an individual. *See* Tex. Penal Code Ann. § 19.02(b)(1). Criminally negligent homicide requires a less culpable mental state of criminal negligence, meaning that the defendant ought to have been aware of a substantial and unjustifiable risk that the individual would die. *See id.* §§ 6.03(d); 19.05(a) (Vernon 2003).

In this case, the State does not dispute that criminally negligent homicide was a lesser-included offense of murder and that Orona was entitled to a criminally-negligent-homicide charge if some evidence in the record would permit a jury to rationally find that if Orona was guilty, he was guilty only of criminally negligent homicide. *See Guzman*, 188 S.W.3d at 188; *Lugo*, 667 S.W.2d at 147. In other words, there must be some evidence that Orona failed to perceive the risk created by his conduct. *See Mendieta v. State*, 706 S.W.2d 651, 653 (Tex. Crim. App. 1986) (requiring evidence showing an unawareness of the risk for charge on criminally negligent homicide); *Jackson v. State*, 248 S.W.3d 369, 371 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (explaining that key to criminal negligence is the failure of the actor to perceive the risk created by his conduct).

Orona argues that there was no evidence that he knew Sartain was an insulin-dependent diabetic, and consequently, he could not have perceived the risk created by his conduct. However, even assuming some evidence existed that Orona was unaware of Sartain's insulin-dependent diabetic condition, no

14

evidence exists that Orona did not intentionally or knowingly cause Sartain's death by punching and kicking him in the face and head. If sufficient evidence of more than one theory of the greater offense is presented to allow the jury to be charged on alternate theories, the second prong of the test is satisfied only if there is evidence that, if believed, refutes or negates every theory that elevates the offense from the lesser to the greater. *See Arevalo v. State*, 970 S.W.2d 547, 549 (Tex. Crim. App. 1998). In other words, any evidence that Orona did not know that Sartain required insulin (negating one theory of murder) would not negate the remaining theories of the greater offense—that Orona intentionally or knowingly caused Sartain's death by kicking or punching him—to enable a rational jury to conclude that Orona was guilty *only* of the lesser-included offense of criminally negligent homicide. *See id.*; *cf. Stadt v. State*, 182 S.W.3d 360, 363 (Tex. Crim. App. 2005) (holding lesser-included-offense instruction warranted when some evidence showed that defendant possessed lesser culpable mental state applicable to each alterative theory alleged in indictment). Consequently, the trial court did not err by refusing to instruct the jury on criminally negligent homicide. *See Guzman*, 188 S.W.3d at 188.

Even assuming that the trial court erred by not including a charge on criminally negligent homicide in the jury charge, any such error is harmless. A jury's failure to find a defendant guilty of an intervening lesser-included offense— an offense between the requested lesser-included offense and the charged offense—may render the trial court's failure to give the requested charge

15

harmless. *Masterson v. State*, 155 S.W.3d 167, 171 (Tex. Crim. App. 2005), *cert. denied*, 546 U.S. 1169 (2006); *Saunders v. State*, 913 S.W.2d 564, 573–74 (Tex. Crim. App. 1995). As the court of criminal appeals explained in *Masterson*,

> This is so because the harm from denying a lesser offense instruction stems from the potential to place the jury in the dilemma of convicting for a greater offense in which the jury has reasonable doubt or releasing entirely from criminal liability a person the jury is convinced is a wrongdoer. The intervening lesser offense is an available compromise, giving the jury the ability to hold the wrongdoer accountable without having to find him guilty of the charged (greater) offense. While the existence of an instruction regarding an intervening lesser offense (such as manslaughter interposed between murder and criminally negligent homicide) does not automatically foreclose harm—because in some circumstances that intervening lesser offense may be the least plausible theory under the evidence—a court can conclude that the intervening offense instruction renders the error harmless if the jury's rejection of that offense indicates that the jury legitimately believed that the defendant was guilty of the greater, charged offense.

155 S.W.3d at 171; *see also Saunders*, 913 S.W.2d at 573–74 (holding that failure to charge jury on criminally negligent homicide was harmless because significant evidence showed that defendant was aware of risk of death, making manslaughter a realistic option for jury).

Here, the jury had the ability to convict Orona of one of the lesser-included offenses of manslaughter or aggravated assault had they any reservation about Orona's guilt of the greater offense of murder. The jury rejected this opportunity, impliedly rejecting Orona's defensive theories that he could not have knowingly and intentionally caused Sartain's death because he was unaware that Sartain was an insulin-dependent diabetic and impliedly rejecting Orona's theory that

16

Sartain was still alive and hiding somewhere. *See Levan v. State*, 93 S.W.3d 581, 586 (Tex. App.—Eastland 2002, pet. ref'd) ("If the jury had harbored a reasonable doubt that appellant intentionally or knowingly caused the victim's death, it would not likely have convicted him of murder anyway for lack of an acceptable compromise."). That the jury convicted Orona of murder despite the availability of manslaughter shows that it believed that Orona possessed the specific intent required for murder. *See Guzman*, 188 S.W.3d at 194 n.20 (noting that any error in refusing charge on deadly conduct was harmless because charged intervening offense of aggravated assault was realistic option for jury). Consequently, even if Orona was entitled to a criminally-negligent-homicide charge, any error by the trial court in refusing to include it in the jury charge was harmless. *See Masterson*, 155 S.W.3d at 171; *Saunders*, 913 S.W.2d at 573–74. We overrule Orona's first point.

## V. TESTIMONY OF THREE WITNESSES

In his third and fourth points, Orona argues that certain testimony of Johns, Brauer, and Osborne regarding statements Munn (who did not testify) made to them constituted inadmissible hearsay, the admission of which violated his right to cross-examination under the United States Constitution and the Texas constitution.[2]

---

[2]Orona does not contend that the Texas constitution provides greater protection than the United States Constitution; consequently, we analyze his argument only under the Sixth Amendment to the United States Constitution. *See, e.g., Lagrone v. State*, 942 S.W.2d 602, 614 (Tex. Crim. App.), *cert. denied*,

## A. Statements at Issue

Johns testified that he was in his car at a stoplight when Munn jumped into his car. Over defense counsel's hearsay and Confrontation Clause objections, Johns testified to the encounter with Munn as follows:

> [Munn] was asking me, he goes, I know the police talked to you, I need to know what you told them. I said there was nothing to tell them, you know. I can't tell them anything I don't know. . . . He asked me if I still lived in the same spot, and he said the wrong street. I'm like, yeah. He goes, no, you stay on this street. He goes, if I need you, I know where to find you.

Johns took Munn's statements as a threat.

Brauer testified, over defense counsel's hearsay and Confrontation Clause objections, that she was at Munn and Orona's house one day when Munn told Orona in front of her to feed and water his dog as he pointed to the garage. Brauer explained that, to her knowledge, Orona did not have a dog.

Osborne testified, again over defense counsel's hearsay and Confrontation Clause objections, that Munn confided in him that he and Orona "beat on Sartain," "just whooped his ass," because Sartain owed them money.

## B. Confrontation Clause Objections

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const.

---

522 U.S. 917 (1997); *Hale v. State*, 139 S.W.3d 418, 421 (Tex. App.—Fort Worth 2004, no pet.) (analyzing federal and state confrontation claim under federal constitutional standards only because appellant did not distinguish the protections under each).

18

amend. VI. The Sixth Amendment right of confrontation is a fundamental right and is applicable to the states by virtue of the Fourteenth Amendment. *Pointer v. State*, 380 U.S. 400, 403, 85 S. Ct. 1065, 1067–68 (1965); *Shelby v. State*, 819 S.W.2d 544, 546 (Tex. Crim. App. 1991).

A trial court violates an accused's Sixth Amendment rights by admitting a hearsay statement made by a nontestifying declarant if the statement was testimonial and the accused lacked a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004). The threshold issue in our *Crawford* analysis is whether the statements at issue were testimonial. *Wilson v. State*, 151 S.W.3d 694, 697 (Tex. App.—Fort Worth 2004, pet. ref'd); *see Crawford*, 541 U.S. at 51–52, 124 S. Ct. at 1364. The Supreme Court declined to spell out a comprehensive definition of testimonial, but it stated that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374.

Generally, a co-conspirator's statements made in furtherance of the conspiracy are nontestimonial. *King v. State*, 189 S.W.3d 347, 358 (Tex. App.—Fort Worth 2006, no pet.); *Wiggins v. State*, 152 S.W.3d 656, 659 (Tex. App.—Texarkana 2004, pet. ref'd). Moreover, casual remarks made spontaneously to acquaintances are not testimonial in nature. *See Woods v. State*, 152 S.W.3d 105, 114 (Tex. Crim. App. 2004), *cert. denied*, 544 U.S. 1050 (2005); *see also Wall v. State*, 184 S.W.3d 730, 735 & n.11 (Tex. Crim. App. 2006). We review

19

the question of whether a statement is testimonial or nontestimonial de novo. *See Wall*, 184 S.W.3d at 742.

In this case, all of the complained-of testimony was nontestimonial in nature. Munn was a co-conspirator, and the statements he made to Johns after the murder—about talking to the police and knowing where to find Johns—were made in furtherance of the conspiracy in order to conceal Sartain's murder. *See King*, 189 S.W.3d at 358; *Wiggins*, 152 S.W.3d at 659. Similarly, by referring to Sartain as "the dog" in front of Brauer, Munn was attempting to hide from Brauer the fact that Sartain was in the garage. *See King*, 189 S.W.3d at 358; *Wiggins*, 152 S.W.3d at 659. And Munn's statement to Osborne that he and Orona had "beat on Sartain" was a spontaneous, volunteered statement made in front of acquaintances. *See Woods*, 152 S.W.3d at 114. Nothing about the context of Munn's statements to Johns, Brauer, and Osborne would lead an objectively reasonable witness to believe that the statements would be available for use later at trial. *See Crawford*, 541 U.S. at 52, 124 S. Ct. at 1364 (defining testimonial statements to include "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial'"). Consequently, we conclude that the trial court did not err by admitting the complained-of statements over Orona's Confrontation Clause objection. *See Woods*, 152 S.W.3d at 114.

20

## C. Hearsay Objections

Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). But a statement meeting that definition is nevertheless not hearsay if it is offered against a party and is a statement made by a co-conspirator "during the course and in furtherance of the conspiracy." Tex. R. Evid. 801(e)(2)(E). The out-of-court statement by a co-conspirator must be more than merely related to the conspiracy; it must further the conspiracy. *See Guidry v. State*, 9 S.W.3d 133, 148 (Tex. Crim. App. 1999), *cert. denied*, 531 U.S. 837 (2000); *see also Byrd v. State*, 187 S.W.3d 436, 440 (Tex. Crim. App. 2005) (explaining that a statement furthers a conspiracy if it advances the cause of the conspiracy or serves to facilitate it).

Furthermore, a statement that, at the time of its making, so far tended to subject the declarant to criminal responsibility that a reasonable person in declarant's position would not have made the statement unless believing it to be true is an exception to the general hearsay rule. Tex. R. Evid. 803(24). Statements against interest "must be self-inculpatory with corroborating circumstances to indicate the trustworthiness of the statement[s]" to be admissible under rule 803(24). *Woods*, 152 S.W.3d at 112. Both statements that are directly against the declarant's interest and collateral "blame-sharing" statements may be admissible under rule 803(24) if corroborating circumstances

21

clearly indicate their trustworthiness. *See Walter v. State*, 267 S.W.3d 883, 899 (Tex. Crim. App. 2008).

We review a trial court's decision to admit or to exclude evidence under an abuse of discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *see also Coffin v. State*, 885 S.W.2d 140, 149 (Tex. Crim. App. 1994) (holding that ruling on admissibility of out-of-court statement under hearsay exception is within trial court's discretion, subject to review only for abuse of discretion). A trial court does not abuse its discretion as long as the decision to admit or to exclude the evidence is within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (op. on reh'g).

Here, as we explained above in our Confrontation Clause analysis, Munn was a co-conspirator, and the statements he made to Johns and in front of Brauer after the murder were made in furtherance of the conspiracy in order to conceal Sartain's murder.[3] Consequently, those statements were not hearsay,

---

[3]To the extent that Brauer's testimony that Munn pointed toward the garage while referring to "the dog" constituted inadmissible hearsay, its admission was harmless error because the fact that Sartain was in the garage was admitted into evidence through Morante's and Osborne's testimony. *See Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010) (holding that any error in the admission of evidence was harmless in light of the proper admission into evidence of very similar evidence), *cert. denied*, No. 10-6446 (U.S. Jan. 10, 2011); *see also Foster v. State*, 779 S.W.2d 845, 862 (Tex. Crim. App. 1989) (explaining that nonverbal conduct is considered hearsay when it is an assertive substitute for verbal expression), *cert. denied*, 494 U.S. 1039 (1990); *Graham v. State*, 643 S.W.2d 920, 926 (Tex. Crim. App. 1981) ("[A]n assertion by conduct can be hearsay.").

22

and the trial court did not abuse its discretion by admitting them over Orona's hearsay objection. *See* Tex. R. Evid. 801(e)(2)(E); *King,* 189 S.W.3d at 360; *see also Byrd*, 187 S.W.3d at 440.

What remains is Munn's statement to Osborne that he and Orona "beat on Sartain," "just whooped his ass." This statement equally exposes Munn and Orona to criminal responsibility for assaulting Sartain. *See Walter*, 267 S.W.3d at 899 (explaining that statements that equally implicate declarant and defendant may be admissible under rule 803(24)). And the trustworthiness of the statement is corroborated by other testimony in the record showing that Munn and Orona beat up Sartain; Johns testified that he witnessed Munn and Orona beat up Sartain, Brauer and Morante both testified that they saw blood on Orona's and Munn's shoes, and Craven testified that Munn showed him photographs of Sartain in which his head looked "like a melon." *See Woods*, 152 S.W.3d at 112. Because the statement at issue was admissible under rule 803(24) as a statement against interest, the trial court did not abuse its discretion by admitting it over Orona's hearsay objection. *See* Tex. R. Evid. 803(24).

Having addressed all of Orona's complaints under his third and fourth points, we overrule those points.

23

## VI. CONCLUSION

Having overruled Orona's eight points, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL:  DAUPHINOT, WALKER, and GABRIEL, JJ.

DAUPHINOT, J. filed a dissenting opinion.

PUBLISH

DELIVERED:  February 24, 2011



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-09-00182-CR

ALEJANDRO ORONA                                          APPELLANT

V.

THE STATE OF TEXAS                                          STATE

----------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

----------

## DISSENTING OPINION

----------

I write separately because the facts of this case are confusing and make it difficult to understand which evidence must be and has been corroborated, which evidence must be and has not been corroborated, and which evidence does not require corroboration. Another issue is the evidentiary value of statements made

1

by a nontestifying co-defendant, Kelly Munn, to third persons over objections to denial of confrontation.  Appellant Alejandro Orona challenges the sufficiency of the evidence.  The State was required to prove each and every element of the offense that it alleged Appellant had committed,[1] not merely that something bad happened.  It is easy to get swept up in the sheer brutality of what the State believes happened and to forget the mundane, unemotional role this court must serve.  For these reasons, I write to perform a pedestrian analysis of the evidence.

## The Evidence

Natalie Bazan was arrested while attempting to cash a forged check for Scott Sartain.  Bazan and Brian Johns, her husband, searched for and confronted Sartain at Munn's house and assaulted Sartain by hitting him.  Munn joined in the assault as Sartain was trying to leave Munn's house.  Appellant entered the room, saw Munn beating up Sartain, and started kicking and hitting Sartain.

Munn said, "Go to sleep, bitch," as he was hitting Sartain.  Bazan and someone else, perhaps Sanjuana Garcia, "told them to stop it."  Bazan, Johns, Garcia, Melissa Morante, Jose Vasquez, and other people in the house except Munn and Appellant left while "the beating was still going on."

---

[1]*See Butler v. State*, 769 S.W.2d 234, 239 (Tex. Crim. App. 1989), *overruled on other grounds by Geesa v. State*, 820 S.W.2d 154, 161 (Tex. Crim. App. 1991), *overruled on other grounds by Paulson v. State*, 28 S.W.3d 570, 571 (Tex. Crim. App. 2000).

2

All the above testimony came from Johns. The second count of the indictment alleged, in part, that Appellant intentionally or knowingly caused the death of Sartain by kicking or by punching him. There is no evidence of any other assault. If Sartain was beaten to death, under the law of transferred intent,[2] Johns and Bazan are accomplices of both Munn and Appellant and subject to the accomplice witness rules.[3]

Johns also testified that on a later day he returned to the house at Munn's invitation. He saw Sartain's head in Munn's hand, and Appellant was standing next to Munn at the time. Johns testified that on this visit, the house smelled of rotten garbage and spoiled meat—like a dead animal.

Rebecca Brauer testified that she had seen blood on Appellant's shoe, that Munn and Appellant had mopped the floor one day, and that she thought Appellant had told her something in Spanish that she believed meant to feed and water the dog, although she knew of no dog. But she said that she had seen a pit bull puppy at Munn's house before. Brauer had seen Sartain inject insulin and said that she found out later from Detective Ford that Sartain needed it twice a day, although he did not take good care of himself and injected street drugs.

Dennis Osborne had no connection to the beating of Sartain. Osborne testified that Munn had told him in Appellant's presence that they had gotten into

---

[2]*See* Tex. Penal Code Ann. § 6.04(b) (Vernon 2003).
[3]*See Kutzner v. State*, 994 S.W.2d 180, 187 (Tex. Crim. App. 1999); *McFarland v. State*, 928 S.W.2d 482, 514 (Tex. Crim. App. 1996), *cert. denied*, 519 U.S. 1119 (1997).

3

a fight with Sartain. According to Osborne's statement to Detective Ford, Munn told Osborne that he and Appellant fought Sartain because Sartain owed Munn money.

Osborne testified that Munn told him that "they both beat on [Sartain] . . . . They just whooped his ass." According to Osborne's statement to Detective Ford, Munn also told Osborne that they had tied Sartain up at one time. Osborne testified that Munn told him that Sartain had broken ribs, was dehydrated, and needed food because he was diabetic. In his written statement, Osborne reported that Munn had told him that he thought that he had broken Sartain's ribs and that Sartain had trouble "getting up and walking around or breathing." Osborne testified that Munn asked him to go get Sartain a hamburger and to feed and check on him. Osborne testified that he told Munn that he would but then did not. Appellant was not present for this conversation. In his statement to the police, Osborne said that Munn told him a day or so later that Sartain had recovered.

Osborne testified that at some point he returned to Munn's house and saw Munn and Appellant mopping and taking trash out. The electricity had gone off, and "they left some food out and it stunk pretty bad in there." Osborne said the house smelled like hot garbage and nasty meat. He had heard that Sartain was in the garage, but he did not see him. Osborne testified that a room behind the garage contained a lot of garbage bags, and the smell was stronger "back in that area of the house."

4

While Munn was cutting Osborne's hair in the bathroom and Appellant was mopping the hallway and the kitchen, Munn told Osborne that he could not believe that they had done that to Sartain and that they had not wanted it to happen. Munn told Osborne that "they cut him up." Osborne testified that he was "not sure" but was "pretty sure" that Appellant overheard the conversation. Munn told Osborne that he had tried to get insulin for Sartain but could not find it. Munn also told Osborne that Sartain had died on Appellant's watch and that Appellant was supposed to have given Sartain food and water but did not.

Osborne refused to help dispose of the body and never saw it. He saw a car that he later heard was Sartain's. Osborne helped mutual friend Shannon Marlowe and another man load the car onto a dolly while Munn and Appellant were away from the house. He also helped put a couple of trash bags into the car, and he remembered seeing a bathtub in the bed of the truck pulling the car. He did not see what was in the garbage bags but described it as tree brush. Osborne heard that the car "went somewhere in Waco."

Osborne testified that he had full access to the house and garage and could enter through the garage. He never saw Sartain or any blood in the garage or back room. But in his statement, Osborne said that he did not go to the house for about a week after Munn asked him to get Sartain a hamburger, and when Osborne did return, he saw what could have been blood stains.

Appellant had a running confrontation clause objection with regard to Osborne's testimony as to all statements made by Munn.

5

Morante testified that she saw Appellant, Munn, Johns, and Johns's girlfriend beating up Sartain. Johns was holding Sartain while the girlfriend beat Sartain. Then Munn, Appellant, and Johns joined in the beating and kicking. Morante said that she, Garcia, and Vasquez told them to stop, and Munn told her to shut up and stay out of it. When Morante left, she saw Johns dragging Sartain back toward Munn's room. Morante and Vasquez went back the next day and heard loud music and moaning in the garage. She testified that both Munn and Appellant told her that Sartain was making the noise, and she noticed that both men had blood on the tips of their shoes. Morante also testified that Johns told her that he went in the garage and saw "that they were cutting him [Sartain] in pieces."

Chris Craven testified in exchange for promises of leniency that Munn told him that "they" had cut Sartain up and put him in the trunk of a car and disposed of the body in the lake. Craven stated that Munn had explained that they had killed Sartain because he owed Munn money and that Munn had also told him that it was hard to get the smell out of the house and that they had used a lot of chemicals to get the smell out.

Munn showed Craven photos of Sartain on his cell phone. Sartain's head was "like a melon." Munn told Craven that he did not want to end up like that, and he should pay Munn quickly.

**Analysis**

6

There is testimony that Johns and Bazan participated in the beating.  If section 7.02(a) of the penal code alone is the law of parties, then the analysis is different than if section 7.02(b) is also the law of parties and not of co-conspiracy.[4]  The legislature may have intended section 7.02(b) to be the law of transferred intent, which originally applied to homicide cases[5] and was later expanded to felony murder.[6]  The Texas Court of Criminal Appeals in *Montoya v. State*,[7] however, announced that both section 7.02(a) and section 7.02(b) of the penal code describe the law of parties.[8]  I have voiced my disagreement with this position.[9]  But if we are required to follow the Texas Court of Criminal Appeals's analysis of section 7.02, then all co-conspirators are parties to murder, not to the offense of conspiracy to commit murder, and Johns and Bazan are parties to murder, not under the theory of transferred intent, but because they are co-conspirators, even though they may not have intended Sartain's death.  That is, the result may not have been the result they had intended, but they are still

---

[4]*See* Tex. Penal Code Ann. § 7.02 (Vernon 2003).
[5]*See generally Washburn v. State,* 167 Tex. Crim. 125, 318 S.W.2d 627 (1958), *cert. denied*, 359 U.S. 965 (1959).
[6]*See generally Kuykendall v. State,* 609 S.W.2d 791 (Tex. Crim. App. 1980), *disavowed on other grounds by Cook v. State*, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993) (*citing Madden v. State*, 799 S.W.2d 683, 686 n.3 (Tex. Crim. App. 1990), *cert. denied*, 499 U.S. 954 (1991)).
[7]810 S.W.2d 160, 165 (Tex. Crim. App. 1989), *cert. denied*, 502 U.S. 961 (1991).
[8]*See* Tex. Penal Code Ann. § 7.02.
[9]*See, e.g., Barnes v. State*, 56 S.W.3d 221, 240–41 (Tex. App.—Fort Worth 2001, pet. ref'd) (Dauphinot, J., concurring) (majority opinion overruled by *Bell v. State*, 169 S.W.3d 384, 398–99 (Tex. App.—Fort Worth 2005, pet. ref'd)).

criminally responsible for the acts of Munn and Appellant.[10]  If Bazan and Johns are parties, their testimony must be corroborated by someone or something other than testimony of another party or the hearsay statement of another party.[11]

The State offered oral confessions of Munn, but Munn was not made available for confrontation and cross-examination, and there was proper objection.

Additionally, evidence of a beating is not necessarily evidence of murder. Blood on the toes of shoes corroborates testimony of assault by beating and kicking, but not necessarily of murder.  Evidence of the odor of garbage is evidence of a bad smell, but do we know that Sartain lay dead in Munn's house long enough for the odor to be that of Sartain's decaying body?  There was testimony of food, including chicken and dumplings, left to rot on the stove when the electricity went out in the summer.

An alternative theory of prosecution was that Appellant intentionally or knowingly caused Sartain's death by preventing him from obtaining insulin when Appellant knew that Sartain was an insulin-dependent diabetic.  There is evidence that Munn knew Sartain needed insulin and that Munn told Osborne that Sartain needed insulin.  Indeed, knowing Sartain needed insulin, and knowing Sartain was being held prisoner, Osborne told Munn that he would bring

---

[10]*See* Tex. Penal Code Ann. §7.02(b); *Montoya*, 810 S.W.2d at 165.
[11]*See* Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).

8

Sartain food but did not. Morante also knew that Sartain injected insulin. But what is the evidence that Appellant knew that Sartain would die without insulin?

The third theory of prosecution was that Appellant intentionally or knowingly caused Sartain's death by a manner and means unknown to the grand jury. What is the evidence that Appellant, either as a principal or as a party, intended to cause Sartain's death or knew that his actions would cause Sartain's death? What is the evidence of murder rather than manslaughter?

The testimony against Appellant regarding his conduct after the original fight, other than testimony of his presence and his cleaning the house and garage, was primarily a recitation of statements by Munn. Munn said that he and Appellant cut up Sartain's body. Munn told Osborne that Sartain owed him and Appellant money and that they both had beaten Sartain and put him in the garage. But Munn also told Osborne that Munn was trying to find insulin for Sartain and that Sartain had died while Appellant was responsible for him.

The fact that the evidence may be admissible as an exception to the hearsay rule does not mean that it necessarily satisfies the burden of corroboration. The Texas Court of Criminal Appeals has discussed the application of evidentiary rule 803(24) in *Guidry v. State,*

> We have recognized that Rule 803(24) "provides for an exception to the hearsay rule for a statement against the *declarant's* interest (, but) . . . does not provide a hearsay rule exception for a declarant's statement which is against *someone else's* interest, e.g. a third-party, a co-actor, or a co-defendant." That is, unless the statement against the third party's interest *is also* sufficiently against the declarant's interest as to be reliable. For example, in *Dewberry v.*

9

*State,* statements in which the declarant ("Chris") incriminated both himself and the defendant, jointly, were held sufficiently reliable . . . .[12]

The *Guidry* court explained that while a statement against the declarant's penal interest may be reliable, it is doubtful that a statement against someone else's penal interest possesses "particularized guarantees of trustworthiness" sufficient to overcome the presumption of hearsay unreliability.[13] Additionally, rule 803(24) requires evidence that "corroborating circumstances clearly indicate the trustworthiness of the statement."[14] An accomplice cannot corroborate another accomplice's testimony.[15] What is the evidence that corroborates the statements of Munn and of the other accomplices? Indeed, what is the evidence, other than Munn's statement that he tried unsuccessfully to find insulin for Sartain, that Sartain was deprived of insulin?

Lest I be misunderstood, I am not saying that the evidence is insufficient because there is an alternative reasonable hypothesis not consistent with Appellant's guilt. I am asking what evidence corroborates accomplice testimony of intentional and knowing murder and whether the State can lawfully prove murder by accomplice statements that were not subjected to confrontation and

---

[12]*Guidry v. State*, 9 S.W.3d 133, 149 (Tex. Crim. App. 1999) (citations omitted), *cert. denied*, 531 U.S. 837 (2000).
[13]*Id.* at 151.
[14]Tex. R. Evid. 803(24).
[15]Tex. Code Crim. Proc. Ann. art. 38.14.

cross-examination.[16]  Because the majority does not answer these questions, I must respectfully dissent.

LEE ANN DAUPHINOT<br>
JUSTICE

PUBLISH

DELIVERED:  February 24, 2011

---

[16]*See* U.S. Const. amends. V, VI; *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 1364 (2004).