

# NUMBER 13-17-00617-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI–EDINBURG

---

**VICTOR MANUEL FLORIDO
ORDONEZ,**                                                **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                **Appellee.**

---

### On appeal from the 206th District Court
### of Hidalgo County, Texas.

---

## MEMORANDUM OPINION

### Before Justices Benavides, Hinojosa, and Perkes
### Memorandum Opinion by Justice Perkes

A jury convicted appellant Victor Manuel Florido Ordonez of murder, a first-degree

felony, and after finding the enhancement paragraph[1] true in punishment, assessed a

---

[1] Ordonez was indicted as a repeat felony offender. Ordonez did not contest his repeat felony offender status, stipulating to one prior felony conviction for robbery, and thus enhancing the punishment

sentence of life imprisonment in the Texas Department of Criminal Justice, Institutional Division. *See* TEX. PENAL CODE ANN. §§ 12.42(c)(1), 19.02. By one issue, Ordonez argues the evidence was legally insufficient to support a conviction. We affirm.

## I. BACKGROUND

On February 20, 2016, Eleazar Vega Vela was hospitalized with serious bodily injuries following an assault that occurred outside Los Tres Chiflados Bar in downtown McAllen, Texas. That evening, Ordonez was arrested nearby for public intoxication. Ordonez was subsequently charged with aggravated assault after an investigation into Vela's assault yielded Ordonez as a suspect. Vela remained in a vegetative state for five months until he died of complications on July 6, 2016. Ordonez was then indicted for murder.

### A. State's Case-in-Chief

At trial, McAllen Police Department Officer Paul Ramos testified that he was initially flagged down by pedestrians in the bar district on February 20, 2016, and immediately after, he received a call from dispatch concerning a fight in the alley behind Los Tres Chiflados Bar. He was first on the scene when he found an unconscious man lying near a dumpster. The man was later identified as Vela. Officer Ramos testified that although multiple witnesses were present, only one was cooperative. According to Officer Ramos, bystander Raul Medina told him that he had witnessed the victim get into an argument with a bar owner named Meme. Medina claimed Meme sent another man to assault Vela and provided Officer Ramos with a description of the alleged offender: the offender wore a red plaid shirt and had a ponytail.

---

range from five to ninety-nine years to fifteen years to life imprisonment. *See* TEX. PENAL CODE ANN. § 12.42(c)(1).

Officer Candace Garza assisted Ramos that evening and testified that she also made contact with Medina. Officer Garza stated Medina informed her that the suspect's name was Victor, and he wore a red checkered button-up shirt. Officer Garza said another witness, who declined to identify herself, advised her that the suspect was at a nearby bar named La China Bar. Upon entering La China Bar, Officer Garza located an individual matching the description provided by Medina and the anonymous female. The man identified himself as "Victor," and Officer Garza observed blood on his hands, shirt, and boots. Officer Garza testified Ordonez appeared to be heavily intoxicated, so she arrested him for public intoxication.

Once law enforcement became aware of the severity of Vela's injuries, Investigator Carlos Garcia was assigned to the case. Investigator Garcia testified that he took a recorded statement from Ordonez the day after his arrest. Garcia noted that Ordonez had several cuts on his knuckles and fingers. Ordonez attributed the cuts on his hands and blood on his clothes to various accidents that occurred 2–3 days prior. In the interview, Ordonez denied involvement in the assault on the evening in question and implied that he could not recall what happened because he was intoxicated, stating, "no, the thing is that I drank fifteen beers, but . . . —when you don't know what—you're doing is [sic] when you just had too much to drink."

Testimony by Vanessa Nelson, a DNA analyzer with the Texas Department of Public Safety Crime Lab, indicated testing of DNA samples retrieved from Ordonez's jeans and right boot revealed a DNA profile consistent with Vela's DNA. Investigator Garcia concluded that the witness statements and physical evidence, including blood recovered from the alleyway and near the dumpster, supported a finding that Ordonez

3

punched Vela, repeatedly kicked Vela once he was down, and then attempted to drag Vela's unconscious body.

The State also called Raul Montalvo, a witness who was not named in any officer reports, to testify. Montalvo claimed to be an acquaintance of both men involved. Montalvo testified that he was approximately twenty-feet away when he witnessed a verbal altercation between Vela and Ordonez escalate. Vela attempted to walk away from Ordonez, and Ordonez then "went after" Vela and punched him. Montalvo testified Vela immediately fell to the ground and appeared "knocked out." According to Montalvo, Ordonez then "started kicking [Vela's] face," and after about ten kicks, Ordonez tried to drag Vela to a nearby dumpster. Montalvo testified that he believed Ordonez intended "to kill [Vela]" that night.

Dr. Norma Jean Farley, a forensic pathologist for Hidalgo County, also testified. Dr. Farley ruled Vela's death as a homicide due to complications from blunt force head trauma. Dr. Farley explained that Vela was admitted to the hospital with injury to his cerebrum, internal bleeding, and fractured ribs. According to Dr. Farley, because of the assault on February 2016, Vela lived the remainder of his life in nursing home care with a gastronomy tube in his abdomen for feedings, a tracheostomy tube to alleviate chronic respiratory issues, and a "PEG tube" to help Vela swallow. Vela was hospitalized multiple times between February and July 2016 due to recurring infections and ulcers. On cross-examination, Ordonez asked whether Vela's history of alcohol and cocaine use inhibited his recovery. Dr. Farley opined that Vela's substance use would not have affected his ability to respond to infections months after he ceased use. Dr. Farley testified Vela remained in a "persistent vegetative state" for five months leading up to his

4

death, and "[e]ven if [Vela] died from complications at the facility, this would be due to the original blunt force trauma that brought him to the facility to begin with."

**B.    Defense's Case-in-Chief**

The defense called two witnesses in its case-in-chief:  Julio Tijerina, Jr., an alleged witness of the assault, and Dr. Adel Shaker, a forensic pathologist and Chief Deputy Medical Examiner in Nueces County.

Dr. Shaker testified that he agreed with Dr. Farley's overall findings but disagreed with her "interpretation of the final results."  Dr. Shaker stated that Vela's history of alcohol and substance abuse "affected his immunity to fight [a] bacterial infection," and concluded that Vela's cause of death was pneumonia, secondary to complications of a decubitus ulcer.   Dr. Shaker opined that following a review of Vela's medical records, he "could not see evidence of diffuse traumatic blunt force injury to the brain or any subdural—under the dura—subarachnoid or intraparenchymal—inside the brain."

During cross-examination, however, Dr. Shaker responded affirmatively when asked whether "someone hitting someone in the head, whether by punching them or kicking him multiple times, would cause serious bodily injury."   Dr. Shaker also conceded that such an act would be "clearly dangerous to human life."   Dr. Shaker testified that had medics not responded as quickly as they did, Vela would have died on scene.

As with Dr. Shaker, Tijerina's testimony largely contravened the testimony provided by the State's witnesses.   Tijerina testified he witnessed Vela grab Ordonez's throat unprovoked earlier that evening inside La China Bar.   Vela and Ordonez were ordered to leave the bar after a fight broke out, and Tijerina then overheard Vela tell Ordonez, "Do you want to go outside?   I am going to kill you."   Tijerina testified that he watched the two men exit together, but he remained inside the bar.   Tijerina stated he

5

had no knowledge of what happened next. On cross-examination, Tijerina was unable to explain why he did not provide a statement to police that evening, or why he did not attempt to contact law enforcement or the District Attorney's Office with this information prior to testifying. Tijerina admitted that he "refused" to speak to the prosecutor when he was approached outside of the courtroom shortly before taking the stand to testify.

The jury charge provided for the lesser-included offenses of manslaughter and aggravated assault. The jury found Ordonez guilty of murder. Punishment was assessed at life in prison. This appeal followed.

## II. LEGAL INSUFFICIENCY

By a single issue, Ordonez argues that the evidence was legally insufficient to establish that he committed the offense of murder because the State did not prove that he "harbored the required intent or knowledge to kill Vela."

### A.    Standard of Review and Applicable Law

When reviewing claims of legal insufficiency "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[A] reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014) (quoting *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011)). The fact finder is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the testimony and are presumed to have resolved any

6

conflicts in the evidence in favor of the verdict. *See Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008).

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (en banc). A hypothetically correct charge here would instruct the jury to find a defendant accused of murder guilty if it is shown that the person: (1) intentionally or knowingly causes the death of an individual; *or* (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1)–(2).

Absent a confession, an accused's culpable mental state must be inferred from his "acts, words and conduct." *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018) (providing that because "grabbing [the victim] around the neck in a choking motion" was potentially life threatening, "a rational jury could view the choking as indicative of Nisbett's mental state" (citing *In re State ex rel. Weeks*, 391 S.W.3d 117, 125 n.36 (Tex. Crim. App. 2013))); *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991)). The culpable mental state for murder can also be ascertained from an evaluation of the defendant's implausible explanations to the police, the extent of the victim's injuries, and the circumstances surrounding the offense. *See id.* "[W]hen it is established that the individual, with the intent to cause serious bodily injury, commits an act clearly dangerous to human life that results in death[,]" the culpable mental state under § 19.02(b)(2) is satisfied. *See Lugo-Lugo v. State*, 650 S.W.2d 72, 81–82 (Tex. Crim. App. 1983).

**B. Analysis**

The jury charge here, in applicable portion, read as follows:

VICTOR MANUEL FLORIDO ORDONEZ, did then and there intentionally or knowingly cause the death of an individual, namely ELEAZAR VEGA VELA, by kicking the said ELEAZAR VEGA VELA with his foot, OR by striking the said ELEAZAR VEGA VELA with his hand, OR with intent to cause serious bodily injury to an individual, namely ELEAZAR VEGA VELA, commit an act clearly dangerous to human life, to-wit: kick the said ELEAZAR VEGA VELA with his foot, that caused the death of the said ELEAZAR VEGA VELA OR, with intent to cause serious bodily injury to an individual, namely ELEAZAR VEGA VELA, commit an act clearly dangerous to human life, to-wit: strike the said ELEAZAR VEGA VELA with his hand, that caused the death of the said ELEAZAR VEGA VELA, then you will find the Defendant guilty of the offense of Murder, as alleged in the indictment.

Although the charge language follows the applicable statute, *see* TEX. PENAL CODE ANN. § 19.02(b)(1)–(2), Ordonez specifically takes issue with the State's alleged inability to prove his culpable mental state. His argument is twofold: (1) despite eye witness accounts of him striking Vela's face and body and DNA evidence implicating Ordonez, intent to strike an individual does not equate to intent to kill; and (2) the contradictory pathological findings demonstrated injuries sustained by Vela were non-lethal, and therefore, support Ordonez's position that he did not assault Vela with the requisite intent to cause Vela's murder. We disagree.

Our sister courts have consistently held that kicking a victim in the head, with the force reportedly exhibited by Ordonez, is an act that is "clearly dangerous to human life" and capable of causing serious bodily injury. *See id.* § 19.02(b)(1)–(2); *see, e.g.*, *Stepherson v. State*, 523 S.W.3d 759, 764 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("[The] jury reasonably could have concluded that appellant was aware of and consciously disregarded a substantial and unjustifiable risk that [the victim's] death would be the result of the beating."); *Depauw v. State*, 658 S.W.2d 628, 634 (Tex. App.—Amarillo 1983, pet. ref'd) ("[W]e believe that the jury could reasonably conclude that a kick to the head by a person wearing a boot, at least when the kick is delivered with severe

8

and tremendous force, was an act clearly dangerous to human life."); *see also Blaes v. State*, No. 05-18-00488-CR, 2019 WL 2575051, at *4 (Tex. App.—Dallas June 24, 2019, no pet. h.) (mem. op., not designated for publication) (providing that witness testimony reporting the defendant repeatedly punched and kicked the victim with steel-toed boots was sufficient to prove intent to commit an act clearly dangerous to human life).

The State provided testimony from an individual who, in addition to witnessing the altercation between Ordonez and Vela, testified that he believed Ordonez's actions reflected his intention "to kill [Vela]" that night. Montalvo testified that he witnessed Vela attempt to walk away from the escalating situation, and it was then that Ordonez struck Vela with his hand, immediately knocking Vela unconscious. Montalvo told jurors that Vela remained unconscious while Ordonez proceeded to kick Vela's face and body approximately ten times with his boot before attempting to drag Vela's body to a nearby dumpster. Montalvo's statements that he witnessed Ordonez assault Vela with his fists and right foot were further corroborated by the investigator's observation of cuts on Ordonez's hands and the DNA retrieved from Ordonez's clothing and right boot matching the victim's. Although Montalvo's statements may have run contrary to the testimony provided by defense's eyewitness who named Vela as the aggressor earlier that evening, to the extent the inconsistency undermined Montalvo's credibility, we presume the jury was able to weigh the credibility of each witness and resolved any conflicts in favor of the verdict. *See Bartlett*, 270 S.W.3d at 150.

Likewise, it is undisruptive to the verdict that the expert pathologists opined to different findings regarding Vela's cause of death, as the jury was free to exercise its independent judgment and disbelieve any witness, "including scientific and expert evidence and testimony." *Landrum v. State*, 977 S.W.2d 586, 588 (Tex. Crim. App.

9

1998) (en banc); *see Bartlett*, 270 S.W.3d at 150; *see also Caminorreal v. State*, 374 S.W.3d 479, 483 (Tex. App.—Corpus Christi–Edinburg 2012, no pet.) ("When, as here, the testimony of the State's witnesses conflicts with the testimony of the defendant's witnesses, the jury may believe all, part, or none of any witness's testimony."). The defense expert himself conceded that punching or kicking a person multiple times in the head are acts would be "clearly dangerous to human life." And he further opined that without immediate medical intervention, it was likely Vela would have died on scene rather than months later due to complications. *See Vaughn v. State*, 607 S.W.2d 914, 920–21 (Tex. Crim. App. 1980) (holding that appellant was guilty beyond a reasonable doubt of the offense of murder when evidence indicated the victim's cause of death was "due to kicking and stomping and the resultant hemorrhaging from vital organs injured thereby"); *see also Amis v. State*, 87 S.W.3d 582, 587 (Tex. App.—San Antonio 2002, pet. ref'd) (finding sufficient evidence for murder conviction where eyewitness testified that the defendant kicked the victim several times in the head and abdomen "using full force," and the victim eventually died from complications of head and abdomen trauma resulting from the attack). We also note that although Ordonez indicated that he did not remember being involved in an assault because he "had too much to drink," voluntary intoxication does not negate the culpable mental state of a crime. *See* TEX. PENAL CODE ANN. § 8.04(a).

Had the jury had any reservation about Ordonez's guilt, the jury had the ability to convict Ordonez of one of the lesser-included offenses of manslaughter or aggravated assault. The jury rebuffed this opportunity, impliedly rejecting Ordonez's defensive theory that he did not knowingly and intentionally cause Vela's death when he punched and kicked Vela. *See, e.g., Orona v. State*, 341 S.W.3d 452, 462 (Tex. App.—Fort Worth

2011, pet. ref'd) (providing that the jury's decision to convict Orona of murder, thereby declining to convict on a lesser-included offense, was indicative of the jury's refusal to accept Orona's argument that he did not intend to murder the victim when he repeatedly punched and kicked him).

Considering the cumulative force of all of the evidence, viewed in the light most favorable to the verdict, drawing reasonable inferences based on that evidence, presuming the factfinder resolved any conflicting inferences in favor of the prosecution, and deferring to that resolution, we conclude that a rational fact finder could have found each element of murder was proven beyond a reasonable doubt. *See* TEX. PENAL CODE § 19.02; *see also Whatley*, 445 S.W.3d at 166; *Clayton*, 235 S.W.3d at 778; *Vernon*, 841 S.W.2d at 409. We hold the evidence was legally sufficient to support Ordonez's conviction of murder. Ordonez's sole issue is overruled.

## III. CONCLUSION

The trial court's judgment is affirmed.

GREGORY T. PERKES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
25th day of July, 2019.