

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00274-CR

JOHNNY D. BLAYLOCK A/K/A    APPELLANT
JOHNNY D. BAYLOCK

V.

THE STATE OF TEXAS    STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Johnny D. Blaylock a/k/a Johnny D. Baylock appeals his conviction for possession with the intent to deliver a controlled substance; namely, methamphetamine in a quantity of more than four grams but less than

---

[1]*See* Tex. R. App. P. 47.4.

200 grams.[2]  In five points, Blaylock contends that the evidence is insufficient to support his conviction; that the trial court erred by including parole instructions in the jury charge; and that the trial court erred by overruling his objections to the admissibility of certain evidence.  We will affirm.

## II. BACKGROUND

Detective Mike Bali of the Arlington Police Department testified that prior to executing a no-knock warrant on September 11, 2008, a confidential informant had told him that methamphetamine was being sold out of a duplex located at 811 Houston Street, Arlington, Texas.  Bali placed the duplex under surveillance and observed the informant purchase methamphetamine there.  Bali also observed that the duplex had its own surveillance equipment, which according to Bali is consistent with "people dealing narcotics, so they can be aware of other people's presence or law enforcement's presence, they'll be aware that it's there."  Bali said that the informant believed that he had purchased the methamphetamine from a person named Jonathan Coffey.

Based on this information, Bali obtained a search warrant for the duplex located at 811 Houston Street.  The affidavit and warrant list "Jonathan Coffey" as the person the confidential informant purchased the methamphetamine from. After SWAT executed the no-knock warrant, Bali went into the residence and found a man later identified as Blaylock along with a woman named Lori Martin.

---

[2]See Tex. Health & Safety Code Ann. § 481.112(a), (d) (West 2010).

2

According to Bali, there was only one bed found in the single bedroom in the duplex. While executing the search warrant, Bali found over $2,000 cash on Blaylock, $100 in a safe, and mail addressed to Blaylock at the duplex's address. Bali testified that the large amount of cash, consisting almost entirely of denominations of $10 and $20 bills, was consistent with drug dealing. Bali said that Blaylock told him that the duplex was his residence and that Martin was his girlfriend but that she did not stay at the duplex. He also stated that Blaylock never mentioned anyone named Coffey during the execution of the search warrant.

Bali asked and received written permission from Blaylock to search a "green Chrysler car" parked outside the duplex. By Bali's account, Blaylock told him that the vehicle was his and directed Bali to the keys so that he could search it. Blaylock said that in the trunk of the car, he found a "tire fix-a-flat can" with a hidden compartment. He found methamphetamine and baggies inside the compartment. The methamphetamine weighed approximately 20.3 grams. Bali stated that during his investigation and procuring of the warrant, Blaylock's name had never come up. Bali testified that at some point during the investigation, he did learn that Blaylock and Coffey were two different people.[3]

Arlington Police Officer Juan Duran also testified at trial. Duran had conducted surveillance of the duplex in anticipation of the warrant. According to

---

[3]The record indicates that Coffey is Blaylock's son.

3

Duran, Blaylock drove the green Chrysler into the duplex's driveway about ten minutes before the warrant was executed. Blaylock exited the car and went into the duplex.

Detective Pamela Gold of the Arlington Police Department testified that she was at the duplex when officers searched it. Gold said that during the search, she found a jacket in the hall closet with an envelope containing over $1,400 in its pocket.

Officer Matthew Clopton of the City of Arlington Police Department testified that he also participated in executing the search warrant. Clopton was responsible for searching the bedroom and the back portion of the duplex. Clopton said that in the bedroom's dresser, he found two firearms, a magazine clip, two digital scales, baggies, and $635 cash. He also found $100 on top of a chest of drawers and 1.7 grams of methamphetamine in a shot glass sitting on the bed's headboard. The search also revealed a glass pipe used for smoking methamphetamine. Pictures of these findings were introduced into evidence and published for the jury.

Next to testify was Arlington Police Department's Officer Brad Pearce. Pearce testified that he was the custodian of the evidence gathered at the duplex. He is also a trained narcotics investigator. Pearce said that a number of the items collected at the duplex, including firearms, scales, baggies, and surveillance cameras, were items consistent with the sale of methamphetamine and not the type of items you would expect to find from a typical "user" of the

4

drug. Pearce also averred that the amount of methamphetamine found in the vehicle was consistent with a seller of methamphetamine. According to Pearce, the amount of cash was consistent with a person who was "doing extremely well with their sales" of methamphetamine.

The State also called John Harris, a forensic chemist for the Tarrant County Medical Examiner's Office. Harris testified that he had conducted laboratory analysis of the substances seized during the search of the duplex. Harris testified that the amount of methamphetamine seized was greater than four grams but less than 200 grams in weight.

The trial court's coordinator, Dawn Gallagher, testified that Blaylock had missed three court hearings related to this trial over an almost two-year period and that because of this, an arrest warrant was issued for Blaylock. Gallagher stated that Blaylock had a warrant out for his arrest between August 2009 and April 2011 related to his failure to come to court on these charges.

The defense called Blaylock's neighbor, Lilly Thompson. Thompson testified that she had been Blaylock's neighbor for more than three years and that "in and out" traffic increased significantly at times that Blaylock was gone but his son, Coffey, was present. She also testified that Blaylock drives a green Chrysler.

Blaylock testified in his own defense. Blaylock denied selling drugs out of his duplex. According to Blaylock, both Martin and Coffey lived with him at the time the police executed their warrant. He said that the green Chrysler belonged

5

to his daughter and that his daughter allowed him to drive it. Blaylock also said that once his son began to live with him, his son also drove the vehicle. Blaylock said that other people, including his girlfriend, drove the vehicle as well. He said that when his son moved in with him, he had specifically instructed his son not to have drugs in the house. Blaylock testified that he was the person who pulled the green Chrysler into the driveway the night of the search. Blaylock said that he had twice previously served prison time for selling drugs, in 1980 and again in 2000. He also said that at the time of trial, both Martin and Coffey were in prison for drug-related offenses. Blaylock testified that because of signs that Martin was doing drugs and having an affair with Coffey, he had given her a two-week ultimatum to move out shortly before the search was conducted.

By Blaylock's account, the affidavit in support of the warrant not only did not have his name on it, it did not have his son's name on it; rather, according to Blaylock, the affidavit had his cousin's name on it—Jonathan Coffey, who at the time of trial was doing "fed time." Blaylock said he never sold drugs out of the duplex. He said that the surveillance system was nonfunctioning and that he had installed it because people kept stealing his solar-powered decorative lights. Blaylock said that he only had $163 on his person when the police searched him and that Bali's testimony that he found over $2,000 on Blaylock's person was "a lie." He said that the money found in the jacket from the closet belonged to Martin. Blaylock testified on direct that he no longer used or sold drugs: "I came out [of prison] in 2005 this time, and I was done, didn't want to have anything to

6

do with it, had a new life, everything." But on cross-examination, and over his objection to the prosecutor's question, he admitted that while on bond, he tested positive for methamphetamine. He also confirmed that he had been arrested for possession of methamphetamine in March 2011, but he insinuated that the police had planted the drugs on him. He also said that when the warrant was being executed, he overheard the officer talk to his son and that after confirming the son was Johnny and not Jonathan, "the officer let him go." Blaylock said that the same officer came into the room where the police were holding him and declared that Blaylock looked "just like the guy" the officer had let go.

Blaylock admitted that he failed to come to the three trial court hearings. He said he did so because he "got scared and ran." Blaylock said that none of the drugs, guns, or paraphernalia were his. He testified that by the time the warrant was executed, he only occasionally slept on the couch but that otherwise he had ceased living at the duplex while Martin and Coffey were there.

Over Blaylock's objection, the State called Arlington Police Department's officer Patrick Knight as a rebuttal witness. Knight testified regarding Blaylock's arrest for possession of methamphetamine in March 2011. He described how he had been dispatched to investigate a shoplifting call that was completely unrelated to Blaylock when he was contacted by a manager about a couple attempting to pass forged currency at a Wal-Mart. According to Knight, Blaylock was with the individual attempting to use counterfeit currency and Knight detained Blaylock and discovered that he had warrants for his arrest. He said

7

that despite having previously checked for contraband or weapons, he found a baggie of methamphetamine under where he had seated Blaylock. While securing him, Knight said that he pulled the baggie away from Blaylock with his foot.

As a surrebuttal witness, Blaylock called his girlfriend at the time of trial, Holli Wasson. Wasson was with Blaylock when he was arrested for possession in March 2011. According to Wasson, Knight made "a lot of accusations . . . about drugs" the day Blaylock was arrested in Wal-Mart. Wasson testified that Knight actually pushed the drugs "towards" Blaylock prior to arresting him, not away from him.

The jury returned a verdict of guilty and a finding of true to the indictment's habitual offender paragraph. After a punishment hearing, the jury sentenced Blaylock to forty years' incarceration. The trial court entered judgment accordingly, and this appeal followed.

### III. DISCUSSION

#### A.     Sufficiency of the Evidence

In his first point, Blaylock argues that the evidence is insufficient to support his conviction for possession with intent to deliver a controlled substance; namely, methamphetamine greater than four grams but less than 200 grams. Specifically, Blaylock argues that because the confidential informant informed officers that it was Coffey who sold drugs from Blaylock's residence, and because the "evidence is [] just as consistent that [] Coffey sold"

8

methamphetamine from Blaylock's residence, the evidence is insufficient to support the jury's verdict. Blaylock does not analyze why he believes the evidence is not sufficient to uphold his conviction nor does he cite any authority in support of his position. The State counters that the evidence is amply sufficient to support Blaylock's conviction. We agree with the State.

### 1. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, ⸺ U.S. ⸺, 129 S. Ct. 2075 (2009). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, we determine whether the necessary inferences are reasonable based

9

upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007).

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13. In determining the sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, we must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and we must defer to that resolution. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

### 2. The Law on Possession with Intent to Deliver

A person commits the offense of possession of a controlled substance with intent to deliver if the person (1) possesses a controlled substance, (2) knows that the substance is a controlled substance, and (3) intends to deliver the substance. Tex. Health & Safety Code Ann. § 481.112(a) (West 2010). A person possesses an object if he has actual care, custody, control, or management of that object. *Id.* § 481.002(38) (West 2010). Possession need not be exclusive. *Evans v. State*, 202 S.W.3d 158, 162, 166 (Tex. Crim. App. 2006). When the accused is not in exclusive possession of the place where the controlled substance is found, then additional, independent facts and circumstances must link the accused to the substance in such a way that it can

10

reasonably be concluded that the accused possessed the substance and had knowledge of it. *Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005); *Kibble v. State*, 340 S.W.3d 14, 18 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). The following are some links that may circumstantially establish the sufficiency of the evidence to prove knowing possession: (1) the defendant's presence when a search is conducted; (2) whether the substance was in plain view; (3) the defendant's proximity to and the accessibility of the substance; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the substance was found; (12) whether the place where the substance was found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt. *Evans*, 202 S.W.3d at 162 n.12. Not all of these factors must be proved; rather, it is the cumulative logical force the factors have in proving possession that we must consider. *See James v. State*, 264 S.W.3d 215, 219 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). Additionally, absence of some of the factors is not

11

evidence of innocence that must be weighed against the factors that are present. *Id.*

A person intends to deliver a substance if it is his conscious objective or desire to transfer, actually or constructively, the substance to another. Tex. Health & Safety Code Ann. § 481.002(8); Tex. Penal Code Ann. § 6.03(a) (West 2011). Intent to deliver can also be proved by direct or circumstantial evidence. *Rhodes v. State*, 913 S.W.2d 242, 251 (Tex. App.—Fort Worth 1995), aff'd, 945 S.W.2d 115 (Tex. Crim. App.), *cert. denied*, 522 U.S. 894 (1997). Courts also infer the intent with which a person is acting from his acts, words, and conduct. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995), *cert. denied*, 517 U.S. 1106 (1996). With regard to the intent to deliver drugs, pertinent factors include (1) the nature of the location where the defendant was arrested, (2) the quantity of drugs the defendant possessed, (3) the manner of packaging of the drugs, (4) the presence or absence of drug paraphernalia, (5) whether the defendant possessed a large amount of cash in addition to the drugs, and (6) the defendant's status as a drug user. *Williams v. State*, 902 S.W.2d 505, 507 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). These are evaluative factors; evidentiary sufficiency does not require the presence of each factor. *Gaither v. State*, No. 07-10-00669-CR, 2012 WL 280573, at *1 (Tex. App.—Amarillo Jan. 31, 2012, no pet.)

### 3. Analysis

Regarding the links confirming Blaylock's possession of the methamphetamine, the record reveals that Blaylock was present at his residential duplex when officers executed the search warrant. Multiple officers also saw Blaylock arrive at the duplex prior to the execution of the search warrant and exit his green Chrysler—the vehicle where a large amount of methamphetamine and paraphernalia was secreted away in a hidden compartment. The remaining methamphetamine and paraphernalia (including baggies, digital scales, guns, and a pipe) were found in the lone bedroom in Blaylock's residence. Blaylock had access to and the right to possess both locations where the methamphetamine and paraphernalia were found—his vehicle and his residence. He even gave police written consent to search his vehicle and provided them with keys. And large amounts of cash were found on Blaylock's person, in a jacket pocket found in a closet of his residence, and in the lone bedroom.

Regarding the evidence supporting the verdict that Blaylock intended to deliver the methamphetamine, the location of Blaylock's arrest points to intent to deliver. Blaylock's duplex had surveillance cameras, a factor that Bali testified to as being consistent with a house where drugs are sold. Bali observed a confidential informant purchase methamphetamine from Blaylock's duplex. When the warrant was executed, Bali discovered mail addressed to Blaylock at the duplex. Multiple officers testified that Blaylock arrived in a green Chrysler, exited the vehicle, and went into the duplex prior to the execution of the warrant.

13

And Blaylock gave the officers permission to search the vehicle. Regarding the quantity of drugs found, Bali discovered over twenty grams of methamphetamine hidden in the trunk of Blaylock's vehicle. Clopton found an additional 1.7 grams of methamphetamine in plain view in the only bedroom in Blaylock's duplex. The manner in which the methamphetamine was found in Blaylock's car was consistent with delivery of the drug—hidden in a "false" compartment along with small baggies. Additionally, Bali found roughly $2,000 cash on Blaylock's person, Gold discovered another $1,400 cash in a closet inside Blaylock's duplex, and Clopton found $635 cash in the bedroom. The money was largely in the denominations of $10 and $20 bills. Officers testified that these denominations are consistent with a person who sells methamphetamine and that given the amount of cash found on Blaylock and at his residence, he was doing "well" as a methamphetamine seller. Police discovered drug paraphernalia in Blaylock's duplex and in his vehicle. And Blaylock testified that he had twice previously served prison time for delivery of a controlled substance and that he had recently tested positive for methamphetamine. Furthermore, the jury was free to disbelieve Blaylock's testimony that the drugs were not his, that Coffey lived with him and he had told Coffey not to sell drugs out of his home, that he no longer sold drugs, and that the methamphetamine belonged to Coffey and Martin. *See Clayton*, 235 S.W.3d at 778–79.

Considering the necessary reasonable inferences based upon the combined and cumulative force of all the evidence deduced at trial and viewing

14

the evidence in light most favorable to the verdict, a reasonable trier of fact could have found beyond a reasonable doubt that Blaylock possessed the methamphetamine with intent to deliver. *See Cadoree v. State*, 331 S.W.3d 514, 524 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (reasoning that sufficient evidence existed to support intent to deliver where, among other facts, a witness reported that defendant sold drugs out of house where defendant was arrested and defendant was seen by police leaving room where drugs and drug paraphernalia were discovered). We overrule Blaylock's first point.

## B.    Prosecutor's Questioning Officer about What Blaylock Said

In his second point, Blaylock argues that the trial court erred by overruling his objection to the prosecutor's question posed to one of the testifying officers, "Did Mr. Blaylock ever indicate to you that when you're there executing this warrant, that this is all Jonathan Coffey and this all belongs to him?" This question was asked during redirect examination of the witness and after defense counsel had asked the witness a series of questions regarding what Blaylock had said to the officer. The State argues that Blaylock has failed to preserve this issue for your review. We agree with the State.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009). An objection must be made as soon as the

15

basis for the objection becomes apparent.  Tex. R. Evid. 103(a)(1); *Lovill*, 319 S.W.3d at 692; *Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App.), *cert. denied*, 522 U.S. 917 (1997).

Here, Blaylock did not object to the prosecutor's question until after the witness had answered the question, the State had passed the witness, and the trial court asked of defense counsel whether there was, "Anything further."  We conclude that Blaylock did not object to the prosecutor's question as soon as the basis for the objection became apparent and thus failed to present the objection timely.  We overrule Blaylock's second point.

## C.    Impeachment Testimony

In his third and fourth points, Blaylock argues that the trial court erred by overruling his objections to testimony elicited by the prosecutor.  Blaylock argues that during cross-examination, the prosecutor was improperly allowed to ask him about having tested positive for methamphetamine while awaiting trial.  He further argues the prosecutor was improperly allowed to call rebuttal witness Knight.  The State argues that Blaylock created a false impression by testifying that after his prior periods of incarceration, he was "done" with drugs and had "a new life, everything."  Thus, the State contends that it was properly allowed to impeach Blaylock's testimony by questioning him and by calling its rebuttal witness.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard.  *Orona v. State*, 341 S.W.3d 452, 464 (Tex. App.—

16

Fort Worth 2011, pet. ref'd). A trial court does not abuse its discretion as long as the decision to admit or to exclude the evidence is within the zone of reasonable disagreement. *Id.* (*citing Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (op. on reh'g); *Howell v. State*, 175 S.W.3d 786, 790 (Tex. Crim. App. 2005).

An accused puts his character for veracity in issue by taking the stand, and he may be impeached in the same manner as any other witness. *See Hammett v. State*, 713 S.W.2d 102, 105 (Tex. Crim. App. 1986); *West v. State*, 169 S.W.3d 275, 279–80 (Tex. App.—Fort Worth 2005, pet. ref'd). Generally, prior offenses are inadmissible for impeachment purposes unless the offense resulted in a final conviction for either a felony or a crime involving moral turpitude and the conviction is not too remote in time. *See Ochoa v. State*, 481 S.W.2d 847, 850 (Tex. Crim. App. 1972); *Turner v. State*, 4 S.W.3d 74, 78–79 (Tex. App.—Waco 1999, no pet.); *see also* Tex. R. Evid. 608, 609. But an exception arises when a defendant testifies and leaves a "false impression" as to the extent of his prior arrests, convictions, charges against him, or trouble with the police generally. *See Prescott v. State*, 744 S.W.2d 128, 131 (Tex. Crim. App. 1988); *Ochoa*, 481 S.W.2d at 850. In such a case, the defendant is deemed to have "opened the door" to an inquiry into the veracity of his testimony, and evidence of the defendant's prior criminal record is admissible to correct the false impression. *See Martinez v. State*, 728 S.W.2d 360, 362 (Tex. Crim. App. 1987); *Turner*, 4 S.W.3d at 79. As a general rule, the false impression the State seeks to rebut

must be created by the defendant through direct examination. *Wheeler v. State*, 67 S.W.3d 879, 885 (Tex. Crim. App. 2002).

Here, on direct examination, Blaylock left the impression that he had moved on from his previous life of drugs and that he no longer used or sold them. Blaylock specifically said that he was "done" with drugs and that he had "a new life, everything." The trial court allowed the State to elicit testimony that contrary to this claim, Blaylock had recently tested positive for methamphetamine. Blaylock had also testified that the methamphetamine found under him when he was arrested during the pendency of this trial was not his and that the police had told him, "you're wanted for a drug charge. [The packet of methamphetamine is] going with you." The State was allowed to call a rebuttal witness, the arresting officer, to rebut the impression Blaylock gave the jury that he no longer used drugs and that the methamphetamine was not found under him but rather planted near him by the police. In light of the impression Blaylock left with the jury, we conclude and hold that the trial court did not abuse its discretion by allowing the State to impeach Blaylock's testimony by asking him questions related to having tested positive for methamphetamine and by calling Knight as a rebuttal witness. *See Townsend v. State*, 776 S.W.2d 316, 318 (Tex. App.—Houston [1st Dist.] 1989, pet. ref'd) ("The two extraneous offenses were admissible to controvert the false impression left by [the defendant] that he was not the type of person who would commit a sexual offense against a child, and that he was simply the

18

innocent victim of the children's anger and their overactive imaginations."). We overrule Blaylock's third and fourth points.

### D. Parole Instruction in Jury Charge

In his fifth point, Blaylock argues that the trial court erred by overruling his objection to the jury charge's parole instruction. Blaylock does not make a cogent argument as to why the trial court erred by including the parole instruction in the jury charge; rather, Blaylock makes tacit references to the right to a fair trial under the Texas Constitution, the federal due process clause, and the separation of powers doctrine. We conclude that the trial court did not err by including the parole instruction in the jury charge.

Article 37.07, section 4 of the Texas Code of Criminal Procedure requires the trial court to submit a parole instruction to the jury at the punishment stage of trial and sets out the instruction to be submitted. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 4 (West Supp. 2012). Here, the trial court's instruction on parole law in the jury charge tracked the language of the statutory instruction. *See id.* The parole charge is mandatory, and the trial court has no discretion to avoid the statutory requirement that it be submitted to the jury. *Luquis v. State*, 72 S.W.3d 355, 363–64 (Tex. Crim. App. 2002). Various constitutional challenges to the mandated parole charge have been rejected in Texas courts. *See*, *e.g.*, *id.* at 364–66 (holding parole instruction as sanctioned in article 37.07 does not violate the due course of law provision in article I, section 19 of the Texas Constitution or the federal constitution's due process clause). We hold

that the trial court did not err by giving the statutorily required instruction. Blaylock's fifth point is overruled.

## IV. Conclusion

Having overruled all five of Blaylock's points on appeal, we affirm the trial court's judgment.


BILL MEIER
JUSTICE

PANEL:  GARDNER, MCCOY, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  November 1, 2012