

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00381-CR

_____

AARON SEBASTIAN REDMOND, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court No. 1611307R

Before Birdwell, Bassel, and Wallach, JJ.
Opinion by Justice Wallach

## OPINION

Appellant Aaron Sebastian Redmond appeals his convictions for aggravated assault of a family member with a deadly weapon, evidence tampering, and retaliation. All three convictions stem from Redmond's attack of his then-wife, Jane,[1] and his attempts to cover it up in the hours that followed. Redmond raises three issues on appeal challenging the trial court's admission of (1) evidence of his abusive extramarital affair, (2) evidence of his prior unadjudicated bank robberies, and (3) evidence of Jane's conversation with a police officer while she was being treated for her injuries at the hospital. We will affirm the trial court's judgments.

## I. Background

In July 2018, Redmond used utensils and other dinnerware to attack his then-wife Jane in the kitchen of their home.

## A. The Assault

Jane was reaching into the open dishwasher when Redmond approached from behind and stabbed a kitchen knife into her neck—twice. As Redmond pushed Jane down onto the dishwasher, she began to struggle with him and grabbed the knife in her neck, cutting her hand on its blade. Redmond put his fingers in Jane's open wound in an attempt to make her "bleed out," and he repeatedly banged her head on the tile floor. The couple's then-three-year-old son, Bobby, walked into the room and

---

[1]We use aliases for minors and for Redmond's victims to protect their privacy. *See* Tex. R. App. P. 9.10(a)(3); 2d Tex. App. (Fort Worth) Loc. R. 7.

asked Redmond to stop "hurt[ing] Mommy," but Redmond told him to leave and turned on the television in the adjacent living room to distract him.

Meanwhile, Redmond continued to brutalize Jane by carving into her neck with a fork. Each time Jane tried to speak, Redmond hit her or slammed her head against the tile. When Redmond finally stopped, Jane lay on the floor and struggled to breathe. She begged Redmond to get help and not to "let [her] die" promising that she "wo[uld]n't tell anybody." After Bobby—distraught in the nearby living room—echoed Jane's request and begged Redmond to seek help, he pretended to call 9-1-1. Yet, no help came, and Jane's condition grew worse. Jane and Bobby then asked Redmond to take her to the hospital. Redmond finally agreed and wrapped towels around Jane's neck before carrying her to the car, with Bobby joining in the backseat. Jane—fearing she could not survive the trip to the hospital after all—suggested stopping at a nearby fire station instead.

As they drove to the fire station, Jane continued to assure Redmond that she "w[ould] say it [wa]s an accident." Apparently unconvinced, Redmond threatened Jane when they pulled into the station by stating, "Don't make me kill you."

As the firemen—some of whom were also trained as paramedics—helped Jane out of the car, both she and Redmond reported that "she fell" and that the fall "was an accident." Once Jane was alone in an ambulance with the paramedics though, she told them, "You have to help . . . . He's going to kill me. But you have to get my son away."

3

By this time, however, Redmond had already left the fire station and returned home with Bobby. While Jane was being transported to the hospital, receiving treatment for her stab wounds and collapsed lung, and undergoing surgery, law enforcement surrounded the family home. After a four-hour SWAT standoff, Redmond finally emerged from the home with Bobby. When law enforcement entered the home to collect evidence and photograph the crime scene, they found that the floor in the kitchen had been cleaned, the towels saturated with Jane's blood had been washed, and Redmond's bloody clothing had been laundered.

Redmond was indicted for (1) aggravated assault with a deadly weapon of a member of his family, a member of his household, or a person with whom he had a dating relationship; (2) evidence tampering; and (3) retaliation.[2] *See* Tex. Penal Code Ann. §§ 22.02(a), (b)(1), 36.06(a)(1)(A), 37.09(a)(1). Redmond pled not guilty, and the case proceeded to a jury trial.

## B. The Jury Trial

At trial, Jane testified regarding her marriage to Redmond, his history of abuse, and the details of the assault. The State offered photographs not only of Jane's injuries on the night of the assault, but also of her injuries after prior incidents of abuse. Her description of Redmond's kitchen assault was consistent with what she told the

---

[2]Redmond was also indicted for aggravated assault with a deadly weapon, but the State abandoned this count of the indictment prior to the submission of the jury charge.

fireman and paramedic who administered medical care at the fire station (Fireman Kendall), the police officer and SWAT team member who took Jane's statement in the ambulance (Officer Herily), and the police officer who took Jane's statement while she was at the hospital (Officer Harvey), among others. As relevant to this appeal, the trial court allowed Officer Harvey to repeat Jane's description of events on the night of the assault. Redmond objected to the testimony as hearsay, but the trial court overruled Redmond's objection.

Additionally, the State offered and the trial court admitted documentary and video evidence supporting Jane's description of the assault, including a medical report with her statement to Fireman Kendall and a portion of the video footage from Officer Herily's body camera capturing her statements to him in the ambulance.

Redmond then testified in his own defense. Redmond claimed that on the night of the alleged assault, Jane was yelling at him with utensils in her hands and that when he attempted to grab her arms, she "went berserk" and "started thrashing," causing them both to fall into the open dishwasher. Redmond stated that, prior to the fall, Jane had threatened to fabricate an assault so she could have sole custody of Bobby.[3] He claimed Jane's allegations of assault were her way of "c[oming] through on her threat" by "capitaliz[ing]" on the accident "to get [him] locked up."

---

[3]Bobby was the biological son of Redmond's daughter. Jane and Redmond adopted Bobby when he was one to two years old.

During the course of direct examination, Redmond also admitted several indiscretions relevant to this appeal. First, Redmond acknowledged having an affair with Sue,[4] but he indicated that he had ended the affair in 2013 after approximately two years.[5] Redmond claimed that, following the breakup, Sue continued to find "some reason to make contact" but that the contact trailed off after he consistently reiterated that he was "not going there." When asked if the breakup was on "friendly terms," Redmond confirmed that it was friendly "for the most part" although "she wasn't happy about it."

Redmond also admitted that, at the time of his trial, he was incarcerated for a bank robbery that he had committed in February 2017. Redmond characterized the robbery as "a horrible, crazy decision" he made to relieve "financial stress" when he was at "the lowest point" in his life due to "a perfect storm of events"—his business had "generated zero" and shut down, Bobby had undergone two surgeries, Redmond's truck had been stolen, he lost money in an unexplained "incident" in New Mexico, and he was battling an opioid addiction and had recently gone "cold turkey." He testified that he told Jane about the robbery a few months after it occurred

---

[4]Jane and Redmond were married in 2010, and they both met Sue soon after their honeymoon.

[5]Redmond ended his affair with Sue only after Jane discovered videos of Redmond and Sue having sex and confronted him about the affair.

because, in his words, "[i]t was eating at me bad" and "was embarrassing" and "horrible."

Before the State began its cross examination, in a hearing outside the presence of the jury, the State asked permission to explore two lines of questioning regarding extraneous offenses.[6] One line of questioning related to the abusive nature of Redmond's relationship with Sue, and the other related to his history of bank robberies. The State indicated that both lines of questioning were necessary to correct false impressions left by Redmond's testimony—namely, the false impression that his breakup with Sue had been cordial and that she wanted back in his life, and the false impression that Redmond's February 2017 bank robbery was a single, out-of-character episode.

As to Redmond's breakup with Sue, the State explained that it had "reason to believe" that Redmond had abused Sue and that this abuse had contributed to their breakup, and it requested permission "to question him about the information [it] ha[d] that he was assaultive to [Sue] and statements [it] ha[d] from her that were sent to

---

[6]The State appears to have raised Redmond's extraneous offenses with the trial court prior to cross examination out of a belief that the trial court granted Redmond's motion in limine regarding his extraneous offenses and prior bad acts. However, the record indicates that the trial court did not grant the motion in limine, but instead told the parties that it would "take . . . this by objection," advising them that "as you hear anything that you think is objectionable, you just need to bring that to the Court's attention, and we'll take it up then." Regardless, a motion in limine is neither required nor sufficient to preserve error. *See Geuder v. State*, 115 S.W.3d 11, 14–15 (Tex. Crim. App. 2003).

both him and . . . the victim in this case via e-mail about assaults that took place between them." Redmond protested that he had not "opened the door" to this evidence, claiming "[t]here was no mention of why they parted ways[;] [h]e just said they parted ways." The trial court overruled the objection and authorized the State to broach the topic to correct the false impression.

Redmond similarly denied leaving a false impression regarding his unadjudicated bank robberies. He insisted that the only conviction he mentioned was "just for the one bank robbery [i]n February . . . 2017" and that he "d[id not] believe h[e] [had] opened the door to go into everything else." The trial court found that Redmond's testimony left a false impression that the February robbery was "completely out of character and he just did the one thing," and the court stated it would allow the State to explore Redmond's other unadjudicated bank robberies.

The State then proceeded to cross-examine Redmond. However, the State went beyond questioning—it offered documentary exhibits into evidence as well.

First addressing Redmond's relationship with Sue, the State introduced an e-mail from Sue to Jane and Redmond in which Sue alleged that Redmond had been abusive and had tried to kill her:

> Oh, crazy & psycho that's what you came up with? Really? My idea of psycho is the morning that you lost grip with reality, and . . . crying, screaming at me, and spitting on me - in the face, stripping my clothes off me- my jacket, my shirt, no bra, completely exposed in the cold and PUBLIC area, trying to cover myself- so no hands to try to protect myself while you threw me on the ground, picked me up so you could throw me back down again. How many times did that happen? And

8

while you had me on the ground- you would sit on me, trapping my arms so I couldn't move or block your spit from coming at my face, squeezing and shaking me by [my] upper arms or neck over and over hitting my back and head into the asphalt you had thrown me onto, slapping my face and head with my leather jacket, every time I tried to run away from you I was thrown on the ground. How long did this go on? Your crazy scary threats, without a single doubt, I knew you were going to kill me that night. I could not get away from you. And you were oblivious as to how much stronger you were and how much you were really hurting me. All steroided up and taking WAY too much! How many times did my head hit asphalt? How many places was I bleeding from? How many bruises did I end up with? All because I said it was over between us.

When the e-mail was tendered to Redmond for objections, Redmond stated that he "just object[ed] to the relevance of the matter," and the trial court overruled the objection. The State then read the e-mail into evidence. Redmond claimed the e-mail was "obviously not factual" and that "the incident that she's referring to, obviously, was not even remotely close to that." When the State confronted Redmond regarding a citation he had received for assaulting Sue in a separate incident in 2012, Redmond downplayed that as well and claimed Sue was simply mad "because [he] was going home" and that she called the police because "she had left her phone in [his] vehicle" and wanted him to return the device.

Then the State turned to Redmond's February 2017 bank robbery and questioned Redmond regarding his use of a weapon.[7] The State produced a

---

[7]On direct examination, Redmond testified that he "wasn't even armed" during the February 2017 robbery. This testimony contradicted photographs of the robbery that depicted Redmond with a gun. The trial court authorized the State to correct Redmond's false impression by confronting him with the photograph.

photograph of Redmond using a weapon at the robbery, but Redmond claimed it was a toy gun. Asked "[w]hy [he] would . . . take a toy gun to this event," Redmond responded, "It's not like I had a lot of experience." The State then questioned Redmond regarding his alleged lack of experience by confronting Redmond with three additional bank robberies he had been accused of committing after the February robbery in 2017. The State even offered a photograph of Redmond robbing the same bank he had robbed in February 2017 only two months after the initial robbery. When the photograph was tendered to Redmond, he stated he had "[n]o objection."

Redmond was the only witness called in his defense, and after he finished testifying, the trial court charged the jury. Although Redmond did not request a limiting instruction regarding his extraneous offenses, the trial court nonetheless included one in the charge. The jury found Redmond guilty of all three counts listed in the indictment: (1) aggravated assault with a deadly weapon of a member of his family, a member of his household, or a person with whom he had a dating relationship; (2) evidence tampering; and (3) retaliation. After hearing punishment evidence, the jury assessed the maximum penalty for each offense: (1) life imprisonment and a $10,000 fine for aggravated assault with a deadly weapon; (2) ten years' confinement and a $10,000 fine for evidence tampering; and (3) ten years' confinement and a $10,000 fine for retaliation.

## II. Discussion

Redmond raises three evidentiary challenges on appeal; he complains of the trial court's admission of (1) evidence of the abusive nature of his extramarital affair with Sue, (2) evidence of his prior unadjudicated bank robberies, and (3) evidence of Jane's out-of-court statements to Officer Harvey while she was being treated for her injuries at the hospital.

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Orona v. State*, 341 S.W.3d 452, 464 (Tex. App.—Fort Worth 2011, pet. ref'd). "We give great discretion to the trial court in matters of admissibility of evidence if correct under any theory of law, even if the trial court's underlying reason was wrong." *Wenger v. State*, 292 S.W.3d 191, 202–03 (Tex. App.—Fort Worth 2009, no pet.). A trial court does not abuse its discretion by admitting evidence as long as the decision is within the zone of reasonable disagreement. *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020); *Weatherred*, 15 S.W.3d at 542; *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).

### A. Evidence of the Abusive Nature of Redmond's Extramarital Affair

First, Redmond challenges the trial court's admission of testimony regarding the abusive nature of his extramarital affair with Sue and the court's admission of Sue's e-mail alleging abuse. He claims that, although both the testimony and e-mail were admitted to correct a false impression, no such false impression existed, and that

the e-mail's "highly inflammatory" "unsworn[s] accusations of a missing witness" inflicted harm and were used by the State in "a clear attempt to convict him based on being a criminal generally."[8]

The State insists that the false impression—that Redmond and Sue parted on good terms—indeed existed and that it formed the proper basis for admission of the challenged testimony. However, the State argues that the trial court's false-impression ruling did not extend to the e-mail and that Redmond thus failed to preserve his current challenge to the e-mail for review.[9] The State further asserts that, regardless,

---

[8]Redmond's choice of words in his brief implies numerous challenges to the admissibility of the e-mail: that the e-mail was (1) prejudicial, (2) contained hearsay, and (3) effectively called another witness to correct the false impression. *See* Tex. R. Evid. 403, 802; *Wheeler v. State*, 67 S.W.3d 879, 885 (Tex. Crim. App. 2002). Redmond also implicitly challenges the scope of the State's questioning regarding the e-mail by alleging that the State relied upon the e-mail as improper character evidence—a purpose for which it was neither admissible nor admitted. *See* Tex. R. Evid. 105(a), 404(b)(1). Redmond appears to raise these four issues to support his assertion that the allegedly erroneous admission of the e-mail was harmful, rather than as four separate grounds of error. However, to the extent that Redmond makes these complaints as separate challenges to the judgment, he has not preserved them for review. Redmond did not object to the e-mail as more prejudicial than probative, as impermissible hearsay, or as an improper attempt to call another witness to correct a false impression. *See* Tex. R. Evid. 103(a)(1), 403, 802; Tex. R. App. P. 33.1(a). Nor did he object that the State's questions or statements improperly construed the e-mail as character evidence or encouraged the jury to convict Redmond based on his extraneous offenses. *See* Tex. R. Evid. 404(b)(1); Tex. R. App. P. 33.1(a). Nor did he request a limiting instruction. *See* Tex. R. Evid. 105(b)(1); Tex. R. App. P. 33.1(a). Therefore, to the extent Redmond intends to independently challenge the e-mail on one or all of these bases, we overrule these challenges due to Redmond's failure to preserve the issues for review.

[9]If Redmond failed to properly preserve his objection to the e-mail, any error in the trial court's admission of Redmond's testimony regarding the contents of the e-

both the testimony and e-mail were admissible to rebut Redmond's defensive theory that the assault was an accident and to prove Redmond's intent to commit the charged offense.

The State's latter argument is both persuasive and dispositive. *See* Tex. R. App. P. 47.1. Assuming arguendo that Redmond's no-false-impression objection extended to Sue's e-mail,[10] the trial court nonetheless acted within its discretion by admitting

---

mail was harmless and effectively forfeited. *Cf. Clay v. State*, 361 S.W.3d 762, 767 (Tex. App.—Fort Worth 2012, no pet.) (holding defendant forfeited objection to admission of records by failing to reassert his objection when a witness testified regarding the contents of the records); *Mai v. State*, 189 S.W.3d 316, 323–24 (Tex. App.—Fort Worth 2006, pet. ref'd) (holding defendant failed to preserve error in the admission of a transcript "by not repeating [his] objection again each time the State asked Officer Richie to read from or refer to the transcript"); *cf. also Mallory v. State*, No. 02-17-00279-CR, 2019 WL 618893, at *12 (Tex. App.—Fort Worth Feb. 14, 2019, pet. ref'd) (mem. op., not designated for publication) (holding defendant forfeited challenges to photographs by failing to object to testimony about the contents of photographs); *Sampson v. State*, No. 02-15-00202-CR, 2016 WL 4474339, at *3 (Tex. App.—Fort Worth Aug. 25, 2016, pet. ref'd) (mem. op., not designated for publication) (holding any error in admission of photographs was harmless due to admission of unobjected-to testimony regarding contents of photographs).

[10]The scope of Redmond's no-false-impression objection and the trial court's corresponding ruling is ambiguous. In a hearing outside the jury's presence and just prior to Redmond's cross-examination, the State claimed that Redmond's testimony on direct examination left the false impression that his break-up with Sue was cordial and asked "to question [Redmond] about the information [it] ha[d] that he was assaultive to [Sue] and statements [it] ha[d] from her that were sent to both him . . . [and Jane] via e-mail about assaults that took place between them." The trial court then asked if the State had reason to believe that the alleged abuse was actually "the reason why they parted ways" or if the State was just speculating. The State confirmed that "[i]n terms of the e-mail statement by [Sue], yes." The State did not propose to offer the e-mail as evidence, and the record contains no indication that the State produced a copy of the document during the hearing. Redmond, in turn, claimed that he had not opened the door to Sue's allegations of abuse because "[t]here

13

the testimony and e-mail to rebut Redmond's defensive theory that the charged assault was an accident and to prove Redmond's intent to commit that assault.[11]

**1. Applicable Law**

"[I]t is improper to try a defendant for being a criminal generally," and the Texas Rules of Evidence prohibit the admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1); *Alba v. State*, 905 S.W.2d 581, 585 (Tex. Crim. App. 1995) (citing *Nobles v. State*, 843 S.W.2d 503, 514 (Tex. Crim. App. 1992)); *McNatt v. State*, No. 02-10-00043-CR, 2011 WL 4712002, at *3 (Tex. App.—Fort Worth Oct. 6, 2011, no pet.) (mem. op., not designated for publication). However, this is not to say that evidence of a defendant's extraneous offenses is inadmissible; in fact, "Rule 404(b) is a rule of inclusion rather than exclusion—it excludes only evidence that is offered solely for

---

was no mention of why they parted ways[; h]e just said they parted ways." The trial court stated that it would "allow it on [the false-impression] basis," but did not clarify whether "it" included the e-mail. The scope of "it" is therefore unclear, and Redmond does not directly address the preservation issue on appeal.

[11]Although "issues of error preservation are systemic in first-tier review courts" such as ours, the Court of Criminal Appeals has explained that this "means only that a court of appeals may not *reverse* a judgment of conviction without first addressing any issue of error preservation"; the court of appeals may still affirm the judgment on another basis. *Meadoux v. State*, 325 S.W.3d 189, 193 n.5 (Tex. Crim. App. 2010) (quoting *Menefee v. State*, 287 S.W.3d 9, 18 (Tex. Crim. App. 2009)); *see also Williams v. State*, No. 02-12-00238-CR, 2014 WL 1668491, at *1 (Tex. App.—Fort Worth Apr. 24, 2014, pet. ref'd) (mem. op., not designated for publication) (quoting and relying upon *Meadoux* to affirm judgment of conviction on the merits).

proving bad character and conduct in conformity with that bad character." *Dabney v. State*, 492 S.W.3d 309, 317 (Tex. Crim. App. 2016). Evidence of a defendant's extraneous offenses may be "admi[tted] for another purpose," such as "proving . . . intent" or rebutting a defensive theory that the offense was an accident—a theory Redmond advanced in this case. Tex. R. Evid. 404(b)(2); *see also, e.g., Dabney*, 492 S.W.3d at 317–18; *De La Paz v. State*, 279 S.W.3d 336, 342–48 (Tex. Crim. App. 2009); *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008).

"The 'doctrine of chances' tells us that highly unusual events are unlikely to repeat themselves inadvertently or by happenstance." *De La Paz*, 279 S.W.3d at 347. Thus, evidence that a defendant previously committed a similar extraneous offense may be offered to prove the intentional nature of the defendant's conduct in the face of a defensive theory that the charged offense was an unintentional accident. *Id.* at 347–48 (affirming admission of extraneous-offense evidence because "[t]he extraordinary coincidence that appellant saw drug deals that no one else did three different times flies in the face of common sense"); *see also, e.g., Halliburton v. State*, 528 S.W.2d 216, 218 (Tex. Crim. App. 1975); *Gauch v. State*, No. 02-18-00454-CR, 2019 WL 4010347, at *2 (Tex. App.—Fort Worth Aug. 26, 2019, no pet.) (mem. op., not designated for publication).

### 2. Admissibility

Here, Redmond repeatedly asserted that Jane was injured by accident rather than by intentional conduct. Redmond testified that Jane's injuries were the result of

an accidental tumble onto the dishwasher during a heated-but-not-abusive argument, and Redmond testified that he "didn't intend for her to get hurt." He claimed Jane "capitalized" on the alleged dishwasher accident by fabricating her allegations of assault "to get [him] locked up" so she could have sole custody of Bobby. Redmond also disputed "the prior [abusive] violence that [Jane] told the jury about," claiming the events and injuries Jane described were accidental as well. Redmond testified that Jane never had the black eyes she and her co-worker described to the jury, and he explained away photographs of one of Jane's previous eye injuries as an "exceptional reaction" to pinkeye.

In other words, Redmond's theory of the case was that the alleged assault was an accident, that he did not intentionally harm Jane, and that Jane was fabricating her allegations of intentional abuse. The State rebutted this defensive theory by offering evidence that Redmond had abused another romantic partner as well; namely, Sue. Sue's e-mail alleged that Redmond had abused her during their romantic relationship, that Redmond's physical abuse was significant enough to threaten her life, and that the abuse occurred during the time period in which Redmond was married to Jane. The State also offered evidence that Redmond had received a citation for assaulting Sue on a separate occasion. Redmond explained away Sue's allegations of abuse as he had Jane's allegations: by downplaying the incidents and claiming the complainants were lying.

Evidence of Redmond's abusive relationship with Sue thus constituted "evidence that [Redmond] had on other occasions committed similar offenses to the one he [wa]s charged with [which] serve[d] to reduce the possibility that the act in question was done with innocent intent," to reduce the possibility that Jane's injuries were accidental, and to reduce the possibility that Jane was fabricating her claims. *Hung Phuoc Le v. State*, 479 S.W.3d 462, 470–71 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (affirming admission of drug-related extraneous-offense evidence to refute defendant's claim that he was unaware of the contraband); *see also, e.g.*, *Dabney*, 492 S.W.3d at 315, 317–18 (affirming admission of extraneous-offense evidence to refute defensive theory that defendant "was a victim of circumstance"); *Bass*, 270 S.W.3d at 562–63 (affirming admission of evidence that defendant previously abused two girls to rebut defensive theory of retaliatory fabrication); *Halliburton*, 528 S.W.2d at 218 (affirming admission of extraneous-offense evidence to rebut self-defense theory and prove intent to kill); *Riddle v. State*, No. 02-18-00388-CR, 2019 WL 3334429, at *5–6 (Tex. App.—Fort Worth July 25, 2019, no pet.) (mem. op., not designated for publication) (affirming admission of evidence showing defendant's prior sexual assault of a similar victim under similar circumstances to rebut defensive theory of retaliatory fabrication); *Mendoza v. State*, No. 02-11-00197-CR, 2012 WL 43172, at *5–7 (Tex. App.—Fort Worth Jan. 5, 2012, no pet.) (per curiam) (mem. op., not designated for publication) (affirming admission of extraneous-offense evidence to rebut defensive theory of innocent intent where

defendant previously committed a similar act and claimed similarly innocent intent). Therefore, the trial court was well within the zone of reasonable disagreement—and thus well within its discretion—to admit the testimony and e-mail regarding Redmond's abusive extramarital affair with Sue to rebut his defensive theory that the assault was an accident and to prove his intent to commit the offense. *See De La Paz,* 279 S.W.3d at 347–48.

We overrule Redmond's first point.

## B. Evidence of Prior Bank Robberies

Redmond next argues that the trial court erred by allowing the State to question him about his prior bank robberies. Specifically, Redmond contends that although the trial court authorized the questioning to correct an alleged false impression that Redmond's February 2017 bank robbery was "out of character" and that "he just did the one thing," Redmond never uttered these statements and thus no false impression existed.[12] The State acknowledges that Redmond did not expressly state that the February bank robbery was "out of character" for him or that he had "just d[one] the

---

[12]As with Redmond's first point, the substance of Redmond's second point implicitly challenges the scope of the State's questioning and alleges that the State relied upon the evidence of Redmond's unadjudicated bank robberies as improper character evidence—a purpose for which such evidence was not admitted. *See* Tex. R. Evid. 105(a), 404(b)(1). Again, to the extent that Redmond intends to raise this issue as a separate challenge to the judgment, he failed to preserve it for review. Tex. R. App. P. 33.1(a). Redmond did not object to the State's questions or statements about the unadjudicated bank robberies as improper character evidence or as encouraging the jury to convict him based on these offenses, nor did he request a limiting instruction. *See* Tex. R. Evid. 105(b)(1), 404(b)(1); Tex. R. App. P. 33.1(a).

one thing," but it argues that Redmond's testimony on direct examination nonetheless left the jury with the false impression that the February 2017 bank robbery was a singular incident. We agree with the State.[13]

## 1. Applicable Law

As explained above, extraneous-offense evidence is generally admissible as long as it is offered for "some legitimate, non-character-related purpose." *Montgomery*, 810 S.W.2d at 389; *see* Tex. R. Evid. 404(b)(2); *Dabney*, 492 S.W.3d at 317; *De La Paz*, 279 S.W.3d at 342–44. One legitimate purpose is impeachment.

If a defendant elects to testify in his own defense, he puts his character for veracity at issue and may be impeached in the same manner as other witnesses. *See* Tex. R. Evid. 608–09; *Hammett v. State*, 713 S.W.2d 102, 105–06 (Tex. Crim. App.

---

[13]The State presents multiple alternative arguments, including the argument that Redmond voluntarily doubled down on his false impression during cross-examination by expressly and nonresponsively testifying that "[i]t's not like [he] had a lot of experience" robbing banks when he committed the February 2017 robbery. *See Williams v. State*, 604 S.W.2d 146, 149 (Tex. Crim. App. 1980) ("A conviction will not be reversed for error in receiving testimony that was not admissible when received but that became admissible at a subsequent stage."); *Roberts v. State*, 29 S.W.3d 596, 601 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) ("[W]hen a defendant voluntarily or nonresponsively testifies concerning extraneous matters on cross-examination, the State may correct any false impression presented by such answer."). Although we agree with the State that Redmond made the quoted statement voluntarily and nonresponsively, and although we agree that three prior bank robberies can reasonably be considered "a lot of experience," Redmond's statement did not leave a false impression because the three extraneous bank robberies were committed *after* the February 2017 robbery. Thus, although the record indicates that Redmond "had a lot of experience" robbing banks by the time of trial, there is no indication that he had any experience robbing banks prior to the February 2017 robbery that his statement was referencing.

19

1986). Generally, a defendant may be impeached with extraneous-offense evidence only if the offense resulted in a prior final conviction for a felony or crime of moral turpitude that meets the requirements of Texas Rule of Evidence 609. *See* Tex. R. Evid. 608–09; *West v. State*, 169 S.W.3d 275, 278 (Tex. App.—Fort Worth 2005, pet. ref'd). However, a defendant can also open the door to the admission of other extraneous offenses—including unadjudicated offenses—by creating a false impression regarding the extent of his prior arrests, convictions, charges, or trouble with the police. *See Hammett*, 713 S.W.2d at 105 (quoting *Nelson v. State*, 503 S.W.2d 543, 545 (Tex. Crim. App. 1974)); *West*, 169 S.W.3d at 278. In such instances, the State may correct the false impression with evidence of the relevant portions of the defendant's criminal history. *See Daggett v. State*, 187 S.W.3d 444, 452 (Tex. Crim. App. 2005); *Wheeler*, 67 S.W.3d at 885; *West*, 169 S.W.3d at 278–79. This rule generally applies only if the defendant creates the false impression on direct examination or without prompting from the State; the State cannot manufacture the false impression "by clever maneuvering" on cross-examination and then capitalize on its ruse by admitting evidence of the defendant's extraneous offenses. *Martinez v. State*, 728 S.W.2d 360, 361–62 (Tex. Crim. App. 1987) (quoting *Ex parte Carter*, 621 S.W.2d 786, 789 (Tex. Crim. App. 1981) (McCormick, J., concurring), and distinguishing *Shipman v. State*, 604 S.W.2d 182 (Tex. Crim. App. [Panel Op.] 1980)); *see also Wheeler*, 67 S.W.3d at 885.

**2. Admissibility**

Here, Redmond's testimony on direct examination could reasonably be understood to leave a false impression regarding his February 2017 bank robbery. On direct examination, Redmond portrayed his February robbery as a "crazy decision" brought on by "a perfect storm of events" that brought him to the "the lowest point" in his life. He further testified that he felt ashamed of this "horrible, crazy decision" afterward and that "it was eating at [him]." These statements communicated to the jury that the February robbery was triggered by uniquely horrible circumstances that had not occurred previously and were unlikely to occur again, and that Redmond recognized the stupidity of his actions and was ashamed after committing the robbery. Indeed, at the conclusion of Redmond's direct examination, both the State and the trial court understood Redmond's testimony to have claimed that the February 2017 robbery was "completely out of character" and that "he just did the one thing." Although Redmond accurately observes that he did not use the words "out of character" in his testimony or expressly state that the February offense was his only bank robbery, we do not consider the absence of these specific statements dispositive. A false impression is just that: an *impression*; it need not be expressly stated in magic language to exist. *See, e.g.*, *Carter*, 621 S.W.2d at 788 (affirming trial court's admission of evidence regarding the defendant's criminal history to rebut implied false impression that, apart from the two prior convictions and two prior arrests mentioned in his testimony, his record was clean); *Reese v. State*, 531 S.W.2d 638, 641 (Tex. Crim.

App. 1976) (holding defendant opened the door to multiple prior offenses when, in response to a question about his "trouble with the law," the defendant stated that he pled guilty to car theft because, "[w]hile counsel did not ask if this was all the trouble he had been in, appellant's failure to relate any other instances clearly left the impression with the jury that this was the extent of his 'trouble with the law'"). Redmond's testimony on direct examination implicitly characterized his February 2017 robbery as a singular, deeply regretted, out-of-character event, and his three subsequent bank robberies directly contradicted and debunked this characterization.

The admissibility of evidence regarding Redmond's three extraneous bank robberies was thus within the zone of reasonable disagreement. *See Daggett*, 187 S.W.3d at 452–54 (concluding that evidence regarding defendant's prior sexual relationship with a minor was admissible to correct false impression from defendant's testimony that he "ha[d] never done anything of that sort with a sixteen[-]year[-]old girl" and that he "would not do something like that"); *Carter*, 621 S.W.2d at 788. Given the trial court's "wide latitude to admit or exclude evidence of extraneous offenses" and its "superior position to evaluate the impact of the evidence," we hold that the trial court did not abuse its discretion by admitting testimony regarding Redmond's three extraneous bank robberies. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005); *Wenger*, 292 S.W.3d at 202; *see also Carroll v. State*, No. 02-18-00477-CR, 2020 WL 938189, at *5 (Tex. App.—Fort Worth Feb. 27, 2020, pet. ref'd) (mem. op., not designated for publication); *Warren v. State*, No. 02-19-00023-CR,

22

2019 WL 4124377, at *2 (Tex. App.—Fort Worth Aug. 29, 2019, no pet.) (mem. op.,

not designated for publication).

We overrule Redmond's second point.[14]

---

[14]Redmond's challenge to the admission of testimony regarding his unadjudicated bank robberies fails for another reason as well: any error in the admission of such testimony was rendered harmless by Redmond's failure to object to evidence of the same underlying fact; namely, a photograph depicting Redmond's April 2017 bank robbery. *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998).

When the photograph of Redmond's April 2017 robbery was offered into evidence, Redmond stated he had "[n]o objection," waiving any error regarding the item's admissibility. *See Thomas v. State*, 408 S.W.3d 877, 884–86 (Tex. Crim. App. 2013) (reiterating and clarifying the rule that a no-objection statement waives previously preserved error unless the record "plainly demonstrates" that the defendant and trial court understood otherwise); *Estrada v. State*, 313 S.W.3d 274, 301–02 (Tex. Crim. App. 2010).

The unobjected-to photograph depicted Redmond robbing a bank in April 2017 and thus proved the same fact explored in Redmond's challenged testimony: that the February 2017 robbery was not a singular, deeply regretted incident but was consistent with Redmond's pattern of behavior. Although the photograph depicted only one of Redmond's three unadjudicated bank robberies, Redmond did not distinguish among the unadjudicated offenses. Rather, both parties treated the three unadjudicated robberies collectively as evidence that the February 2017 incident was not atypical. The unobjected-to photograph proved this separate and apart from the challenged testimony.

"[T]he erroneous admission of testimony is not cause for reversal, if the same fact is proven by other testimony not objected to." *Leday*, 983 S.W.2d at 718. Therefore, any error in the admission of Redmond's testimony regarding his unadjudicated bank robberies was rendered harmless by his failure to object to the photograph. *Cf. Sibaluca v. State*, No. 02-19-00150-CR, 2020 WL 6601608, at *7 (Tex. App.—Fort Worth Nov. 12, 2020, pet. filed) (mem. op., not designated for publication); *Mallory*, 2019 WL 618893, at *12; *Sampson*, 2016 WL 4474339, at *3; *Clay*, 361 S.W.3d at 767; *Mai*, 189 S.W.3d at 323–24.

## C. Testimony of Police Officer

In his final point, Redmond argues that the trial court abused its discretion by admitting Officer Harvey's hearsay testimony relaying Jane's description of the assault. *See* Tex. R. Evid. 802. The State responds that the testimony was admissible both as an excited utterance and to rebut the defensive theory of fabrication, but further argues that, regardless, any error in the admission of this evidence was harmless because the same information came in through multiple other witnesses. *See* Tex. R. Evid. 802, 803(2). We agree with the State's latter argument; even if the testimony was erroneously admitted, it was duplicative of other evidence, and Redmond thus effectively forfeited any error in its admission by failing to object to similar evidence showing the same underlying facts.

### 1. Applicable Law

Generally, to preserve error in the admission of evidence, a party must make a proper objection, get a ruling on that objection, and continue to object each time the allegedly inadmissible evidence—or other evidence proving the same underlying fact—is offered. *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) (quoting *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003)); *Sibaluca*, 2020 WL 6601608, at *7. The need for ongoing objections after the trial court has already announced its decision on admissibility is often referred to as "the futility rule." *Leday*, 983 S.W.2d at 718; *Mallory*, 2019 WL 618893, at *11. Failure to comply with this rule effectively forfeits any error in the admission of the objectionable

evidence because "the improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence which is not challenged." *Leday*, 983 S.W.2d at 717 (quoting *Crocker v. State*, 573 S.W.2d 190, 201 (Tex. Crim. App. [Panel Op.] 1978)). "The rule has never been otherwise, so far as we know," and it undercuts Redmond's challenge to Officer Harvey's hearsay testimony. *Id.* at 718.

**2. Harmless Error**

Officer Harvey spoke with Jane while she was receiving treatment at the hospital on the night of the assault. At trial, the officer summarized Jane's description of events in five statements:

> [1] She said that she was in the kitchen with her husband and he asked her to grab something out of the dishwasher. [2] She said that she wasn't able to get it or see what it was, so he said he would do it, so she walked away. [3] He advised that he was able to retrieve the items, so she came back, looked down into the dishwasher, and then he stabbed her in the neck with a knife. [4] She said she then used her left hand to grab the knife out of her neck and he began punching her, beating her on the ground. [5] I asked her if this happened multiple times, if he's done anything like that in the past, and she said, yes, he has been abusive with her.

Assuming without deciding that this testimony was improperly admitted solely for the truth of the matter asserted, its admission was nonetheless harmless. *See* Tex. R. Evid. 801(d)(2). Officer Harvey's brief, five-sentence summary not only mirrored Jane's trial testimony but was corroborated by other, unchallenged testimony and evidence as well.

25

First, Jane testified to all five challenged statements at trial. She explained to the jury how Redmond told her that he "needed to reach something in the dishwasher and his hands wouldn't fit [so he] asked [her] to grab it." This corroborated statement 1 of the challenged hearsay. Jane further stated that she initially thought Redmond was referencing an easily reachable item in the dishwasher so she "went back in the room and laid down"—testimony substantially similar to statement 2. Jane also testified to statement 3. She told the jury that Redmond asked for her help with the dishwasher a second time and that when "[she] reached in[to the dishwasher] . . . he put a knife . . . in [her] throat." Jane went on to explain—consistent with statement 4—that after Redmond stabbed her, she "started fighting back" and "grabbed [the knife] with [her] hands," but that he "push[ed] [her] down on the dishwasher" and she ended up "on [her] knees" while Redmond "bang[ed] [her] head on the tile" repeatedly. Finally, Jane told the jury about Redmond's prior abuse—corroborating statement 5—by describing multiple incidents in which Redmond "push[ed]" her, "sh[ook]" her, "punch[ed]" her, "choked [her] till [she] passed out," or otherwise abused her "to the point that [she] ended up with . . . black eyes or bruising on [her] face." Jane's trial testimony thus provided evidence of the same facts underlying all five hearsay statements. Therefore, Jane's unchallenged testimony, by itself, was sufficient to render the complained-of error harmless.

Yet, we need not rely solely on Jane's testimony because the facts underlying Officer Harvey's hearsay statements were established by numerous other witnesses and trial exhibits as well:

- The medical report from Fireman Kendall—which was admitted as State's Exhibit 4, and which Fireman Kendall described in his testimony—contained a description of the assault that repeated assertions 1, 3, and 4 of the challenged hearsay. Fireman Kendall's report documented Jane's statements that Redmond "woke her up to tell [her] he [had] dropped something in [the] dish[]washer and he needed her small hands to get it," that when she "ben[t] down to [the] dishwasher . . . he stuck a knife to her throat," and that when "she fought back . . . he pushed her against the dish[]washer and hit her and pushed her on the ground and slammed her head on the tile floor multiple times."

- Fireman Kendall's medical report also documented two lacerations on Jane's neck and chest including a three-centimeter gash which he described as a "possible stab"—supporting statement 3 of the challenged hearsay. Fireman Kendall confirmed this assessment in his testimony.

- In the video footage from Officer Herily's body camera—admitted as State's Exhibit 5A—Jane was shown in the ambulance at the fire station.

27

The video showed Jane repeating hearsay statements 1 and 3 by telling Officer Herily that her husband "asked [her] to get something from the dishwasher" and then "stuck a knife in [her] throat."

- Jane's hospital medical records documented Jane's statements that she had been "assault[ed] by her husband" and confirmed that she had "stab wounds to the right neck," supporting statement 3.

- The jury saw photographs of Jane's injuries on the night of the assault, including a stab wound on her neck and extensive bruising on her face and body. The photographs were consistent with the beatings described in hearsay statements 3 and 4.

- The trial court admitted photographs of Jane's injuries from Redmond's prior incidents of abuse, supporting statement 5.

- The jury heard testimony from Jane's co-worker describing how Jane's injuries and behaviors were indicative of abuse, providing additional evidence of statement 5.

Redmond does not challenge any of the evidence catalogued above, even though it proves the same facts that underlie Officer Harvey's testimony. Redmond has not identified—nor has this court found—any aspect of Officer Harvey's challenged testimony that was not admitted elsewhere. We thus hold that any error in the admission of Officer Harvey's hearsay testimony regarding Jane's out-of-court

28

statements was rendered harmless and effectively forfeited. *See Qualls v. State*, 547 S.W.3d 663, 681–82 (Tex. App.—Fort Worth 2018, pet. ref'd) (holding any error in the admission of expert testimony regarding counterfeit nature of bills was harmless because multiple lay witnesses testified that the bills were counterfeit).

We overrule Redmond's final point.

## III. Conclusion

Having overruled all of Redmond's points, we affirm the trial court's judgments.

/s/ Mike Wallach
Mike Wallach
Justice

Publish

Delivered: March 25, 2021